EXHIBIT F

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 7099/BGD/OLG/ESR/MS/JB/JEM

Anthony N. Lapine

(U.S.A.)

vs/

KYOCERA CORPORATION

(Japan)

This document is a certified true copy of the original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

# INTERNATIONAL CHAMBER OF COMMERCE

## INTERNATIONAL COURT OF ARBITRATION

### Final Award

In the Matter of an Arbitration

Between :

Anthony N. LaPine

(hereinafter, « Claimant » or « LaPine »)

And

Kyocera Corporation

(hereinafter « Respondent » or « Kyocera »)

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS,

Jason A. FRY          18·02·08
Secretary General
ICC International Court of Arbitration

Further, both Claimant and Respondent shall be hereinafter collectively referred to as « Parties ».

ICC Arbitration  No. 7099/BGD/OLG/ESR/MS/JB/JEM.

I. Introductory

1. On 14 December 1990 the Claimant filed a request for arbitration (the « Request ») with the Secretariat (the « Court Secretariat ») of the International Court of Arbitration of the ICC (the « ICC Court »).

2. This arbitration has been commenced and takes place pursuant to Section 8.10 of a certain « Definitive Agreement and Plan of Reorganization » (the « Definitive Agreement ») dated as of 10 November 1986 in and between LaPine Technology Corporation (« LTC »), Prudential Bache Trade Corporation (« Prudential »), K.K. P B Trade Corporation (« KK P.B. »); LaPine Holding Company (« LHC »), LTC Merger Corporation (« LTC Merger »), Kyocera, PRU TECH Research and Development Partnership (« PRU TECH ») and LaPine (Prudential, KK P.B. and PRU TECH hereinafter collectively referred to as « Prudential Respondents »), which recites as follows: « (a) Subject Matter. All questions, disputes or differences in any way arising out of or relating to this Agreement, any agreement contemplated hereby to the extent such agreement references this Section 8.10 or the Agreement in Principle or the transactions contemplated herein or therein, including, without limitation, as to the existence, interpretation, validity, application or breach of this Agreement, such referencing agreement contemplated by this Agreement or the Agreement in Principle, or any tort, statutory or other claims arising between or among the parties, shall be settled by arbitration.(b) Rules. The arbitration shall be held in the City and County of San Francisco, State of California. (d) Manner. A party desiring to submit a

matter to arbitration shall give written notice to the other parties hereto. The arbitral tribunal shall consist of three arbitrators, who shall be United States citizens or residents. The three arbitrators shall be appointed by the Court of Arbitration of the ICC. The arbitrators shall decide the matters submitted based upon the evidence presented, the terms of this Agreement, the Agreement in Principle and the laws of the State of California. The arbitrators shall issue a written award which shall state the bases of the award and include detailed findings of fact and conclusions of law. The United States District Court for the Northern District of California may enter judgment upon any award either by confirming the award or by vacating, modifying or correcting the award. The Court shall vacate, modify or correct any award: (i) based upon any of the grounds referred to in the Federal Arbitration Act, (ii) where the arbitrator's findings of fact are not supported by substantial evidence; or (iii) where the arbitrator's conclusions of law are erroneous. (e) Enforcement. Judgment upon awards or orders of enforcement may also be entered by courts to which an award is presented in any other country. Execution upon awards or judgments upon awards may be had in accordance with the law of execution generally applied in each country where enforcement is sought.

3. On page 1 of the Request it is stated that the arbitration was filed « ...for statute of limitation purposes .....» and it is further requested « ...that the proceedings not be commenced until there has been a preliminary award or awards in the previous matter ».

4. The « previous matter » referred to in the Request is ICC arbitration case No. 6070 pending when the Request was filed (the « Previous Arbitration »).

5. On 25 March 1991 Kyocera filed an answer to the Request (the « Kyocera Answer »).

6. On 24 June 1991 the Prudential Respondents filed a joint answer to the Request (the « Prudential Answer »), together with the Prudential Securities Group Inc.;

7. On 21 February 1992 the Court Secretariat wrote to the Parties to inform them that the ICC Court had decided, among other things, that the arbitration could not proceed against the Prudential Securities Group Inc., and to confirm San Francisco, California, U.S.A. as place of arbitration.

8. On 3 April 1992, the Court Secretariat wrote to inform that the ICC Court, at its session of 1 April 1992, appointed Neil F. Phillips Esq. as Chairman of the Arbitral Tribunal and Graydon S. Staring Esq. and Gerald Aksen Esq. as co-arbitrators;

9. By Procedural Order No. 1 of 6 July 1992 the Arbitral Tribunal ruled « that the proceedings of any matter in this arbitration not be commenced until after there has been a final award in the previous arbitration ».

10. On 25 August 1994 a final award on the merits was issued in the Previous Arbitration.

11. Further to discussions in a preliminary hearing held in San Francisco on 18 October 1994 and the unanimous agreement of the parties, by communication of the Arbitral Tribunal of 28 October 1994 all proceedings in the arbitration were stayed in view of proceedings taking place before the US Federal Courts in connection with awards issued in the Previous Arbitration.

2

12. By letter of 9 June 2002 the Court Secretariat took note of the Order of the US District Judge confirming the award in the Previous Arbitration as to Phase 1.

13. By letter of counsel to the Prudential Respondents dated 5 February 2004 to the Court Secretariat, it was confirmed that all judicial or other action regarding awards rendered in the Previous Arbitration had become final.

14. By letter of 12 February 2004 the Court Secretariat invited the Claimant to comment on the constitution of the Arbitral Tribunal on or before 2 March 2004.

15. By letters both dated 30 July 2004, counsel to Kyocera and to the Prudential Respondents suggested that these arbitral proceedings be closed.

16. By letter of 18 August 2004 the Claimant stated that it was not withdrawing the Request and expressed its intention to continue the present arbitral proceedings;

17. By letters all dated 16 August 2005 the Claimant, the Prudential Respondents and Kyocera set forth their respective views regarding the further course of the arbitral proceedings.

18. By letter of 9 February 2006 the Court Secretariat informed the Parties that on 8 February 2006 the ICC Court had appointed Dr. Horacio A. Grigera Naón as Chairman of the Arbitral Tribunal in replacement of the former Chairman of the Arbitral Tribunal, who passed away. The Arbitral Tribunal is presently constituted by its original members Gerald Aksen Esq. and Graydon S. Staring Esq. in addition to Dr. Grigera Naón.

19. By communication of 5 May 2006 the re-constituted Arbitral Tribunal directed the Claimant to file an updated arbitration request (the « Updated Request ») and Kyocera and the Prudential Respondents updated answers according to a calendar set forth in such communication.

20. In response to a request from the Claimant, not objected by the other parties, by communication of 25 May 2006 the Arbitral Tribunal extended the timeline to file the Updated Request until 2 June 2006 and the timeline to file answers thereto until 30 June 2006.

21. On 2 June 2006 the Arbitral Tribunal received an Updated Request and annexes in electronic format; on 30 June 2006 the Arbitral Tribunal received Kyocera's updated answer and counterclaim, that includes a Motion for Summary Adjudication to have the Claimant's claims dismissed for the Claimant's failure or delay to prosecute his claims and to have the Claimant's claims dismissed on the merits for the Claimant's failure to state a valid claim as a matter of law and prove the existence of material facts needing determination (the « Kyocera Motion ») and annexes in electronic format, followed by hard copies received by courier (the « Kyocera Updated Answer and Counterclaim »). No updated answer was received from the Prudential Respondents.

22. The arbitration was initially set in motion by the ICC Court between LaPine on one hand and the Prudential Respondents and Kyocera on the other. However, by e-mail communication of 17 July 2006 sent by the Claimant in response to a question of the Arbitral Tribunal and copied to counsel for the Prudential Respondents and for Kyocera, the Claimant confirmed that all « ...of Claimant's claims against the Prudential Respondents have been withdrawn ». No objection to

such withdrawal has been signified to the Arbitral Tribunal by the Prudential Respondents or by Kyocera. Thus, the present arbitration takes place exclusively between LaPine as Claimant and Kyocera as Respondent.

23. LaPine is represented by Edward M. Gergosian Esq., Robert J. Gralewski Jr. Esq. and Brooke E. West Esq., Gergosian & Gralewski L.L.P.550 West C Street Suite 1600 San Diego California 92101 U.S.A. Facsimile: 619 230 0124; e-mail: ed@gergosian.com. LaPine's address is SEMOTUS, 16400 Lark Avenue, Suite 230, Los Gatos, California 95032 U.S.A.; telephone: 408 358 7011/7100; facsimile: 408 904 7699; e-mail: tlapine@semotus.com.

24. Kyocera is represented by Eugene D. Gulland Esq. and Donald J. Ridings, Jr. Esq. Covington & Burling L.L.P. 1201 Pennsylvania Avenue N.W. Washington D.C. 20004 U.S.A. Facsimile: 202 778 5504; e-mail: egulland@cov.com; dridings@cov.com. Kyocera's address is 6 Takeda Tobadono-Cho, Fushimi-Ku, Kyoto, 612-8501 Japan.

25. Signature of Terms of Reference by LaPine, Kyocera and the members of the Arbitral Tribunal in accordance with Article 13 of the ICC Rules of Conciliation and Arbitration (in force as of 1 January 1988), hereinafter the « ICC Rules », was completed on 18 September 2006.

26. Pursuant to the Parties' agreement to have the Kyocera Motion heard and decided as a preliminary matter the Arbitral Tribunal issued on 18 September 2007 a Procedural Order No.1 providing for the submission of memorials setting forth the Parties' respective positions on the Kyocera Motion and a Hearing scheduled to take place in San Francisco California on 23 January 2007 in order to hear the Parties in that respect.

27. On 18 October 2006 the Claimant submitted a Response to the Kyocera Motion (the « Claimant Response »).

28. On 20 November 2006 the Respondent submitted a Reply Brief in Support of the Kyocera Motion (the « Respondent Reply »).

29. A one-day Hearing took place in San Francisco, California as scheduled in the course of which the Parties further presented to the Arbitral Tribunal their respective positions regarding the Kyocera Motion.

30. On 2 February 2007 the Claimant submitted a Supplemental Compendium of Cases and Statutes cited by the Claimant during the Hearing.

31. On 7 February 2007 the Claimant sent an e-mail including as attachments correspondence exchanged between LaPine and the ICC Court Secretariat in further support of its position adverse to the Kyocera Motion and requesting leave from the Arbitral Tribunal to join such correspondence to the arbitral record.

32. On 8 February 2007 the Respondent wrote to the Arbitral Tribunal in connection with additional cases referred to for the first time by the Claimant during the Hearing.

33. On 20 February 2007 the Respondent wrote again to the Arbitral Tribunal to address matters raised by co-arbitrator Gerald Aksen during the Hearing and in the Claimant's 7 February 2007 e-mail message and attachments.

34. On 11 April 2007 the Arbitral Tribunal requested submissions from the Parties based on standards set forth by the Arbitral Tribunal for deciding on requests for a summary disposal of claims on the merits. In response to the Arbitral Tribunal's request, on 17 May 2007: (a) the Claimant filed an extensive brief accompanied by affidavits and appended court cases in support of its rejection of the summary disposal of the Claimant's claims on the merits (the « Claimant Further Submission »); and (b) the Respondent filed a letter essentially indicating that the Respondent's case in support of the Motion was already laid up before the Arbitral Tribunal in the Respondent's existing briefs and support.

35. In view of the additional elements and arguments joined by the Claimant in its submission of 17 May 2007, the Arbitral Tribunal granted leave to the Respondent to address such additional elements and arguments, which the Respondent did through a submission dated 22 June 2007 (the « Respondent Further Submission »).

36. By letter to the Parties of 17 July 2007 the Arbitral Tribunal declared these arbitral proceedings closed to further submissions or evidence from the Parties regarding the Kyocera Motion.

37. By successive decisions – the last one communicated by letter of the Court Secretariat dated 11 June 2007 – the ICC Court extended the time-period for rendering a Final Award in this case until 30 September 2007.

38. The purpose of this Final Award is to decide on the Kyocera Motion and, subject to such decision, whether Kyocera's counterclaims will be maintained or not.

II. General Background for the Claimant's Claims on the Merits

39. The Claimant claims that in 1986 the Claimant owned 29% of LTC, a company he founded to develop hard disk drives for the nascent personal computer industry. When Kyocera and Prudential acquired LTC in late 1986, the Claimant exchanged his 29% interest in LTC for consideration that included the right to acquire 6.6% of LHC (formed to hold LTC once it was acquired). By the time the Claimant was entitled to exercise that right, however, LTC had been destroyed by the actions of defendant Kyocera. As the tribunal in the Previous Arbitration concluded, Kyocera breached the contract it had entered into with Prudential and the Claimant, and said breaches caused the demise of LTC, rendering worthless the right to acquire 6.6% of LHC, which right the Claimant received for giving up his 29% interest in LTC.

40. The Claimant contends that the Previous Arbitration involved or concerned the same facts, events, issues, and transactions alleged in this matter; and that the tribunal's findings of fact and conclusions of law in the Previous Arbitration should apply with equal force in this case.

41. The Claimant also contends that, within the context of the Reorganization, Kyocera and Prudential represented to the Claimant that, as collective owners of all of LTC stock, they could assure proper management of LTC through a successful public offering.

42. The Claimant further states that in order to consummate the Reorganization, a special meeting of former LTC shareholders took place on 15 December 1986, in the course of which the shareholders were provided with a proxy statement that, among other things, represented that the Reorganization would restructure the existing agreements between LTC, Prudential and Kyocera, including those relating to the manufacture and sale of LTC's products and inventory accounts financing, and conditioned the Reorganization on the resolution of certain disputes then existing among the parties regarding ownership and use of technology and financing and a release of all claims of liability arising from any alleged breaches of the prior agreements between the parties concerning such matters. The Claimant says that in reliance on such representations he executed the Definitive Agreement and all subsidiary documents referred to therein.

43. According to the Claimant, on or about 22 December 1986 counsel to Kyocera informed counsel to LTC and counsel to Prudential that Kyocera did not intend to execute the Amended Trading Agreement (« ATA ») in the form appended to the Definitive Agreement and intended to negotiate a substantially different ATA with Prudential that: (a) would alter the pricing method of products to be marketed by LTC; and (b) substitute LTC for Prudential as the purchaser of the products manufactured by Kyocera. The Claimant indicates that the existence of the Interim Agreement and the Financing Addendum was unknown to the Claimant when he signed the Definitive Agreement, and that had he been aware of their existence, he would not have allowed the Reorganization to close. The Claimant's claims (including alleged economic harm and damages the compensation of which is sought by the Claimant through such claims) are essentially premised on the fact that by failing to execute the ATA as provided for in the Definitive Agreement, Kyocera breached its obligations to the Claimant under the Definitive Agreement.

44. The Claimant alleges that during the negotiations between Prudential and Kyocera relating to the text of the ATA, Kyocera refused to deliver disc drive units to LTC in the required quantities and agreed on prices and insisted on receiving payments in excess of the contractual prices. The Claimant further alleges that, because of such actions, Kyocera substantially contributed to the destruction of the 6.6 % interest in LHC that the Claimant contends he was entitled to acquire under the Definitive Agreement. The Claimant also alleges that after the Definitive Agreement was signed and the terms of the ATA were set specifying that Kyocera would provide drives at 78 % of the market price in U.S. Dollars, the exchange rate between the Japanese Yen and the United States Dollar changed significantly. The Claimant contends that because the ATA fixed the price chargeable by Kyocera to LaPine in Dollars, the terms of the ATA became less favorable to Kyocera. The Claimant alleges this factor as a reason that Kyocera refused to honor the terms of the ATA.

45. The Claimant states that in early June 1987 LTC notified Kyocera that because of Kyocera defaults under the Definitive Agreement, LTC was terminating the interim technology and trading agreement then in place. Thus – the Claimant contends – when on or about March 1988

LTC gave notice to LaPine and the other former LTC shareholders of their right to convert the initial warrants into final warrants, LTC was no longer actively in business and the ongoing litigation between LTC and Kyocera over Kyocera's failure to execute the ATA in the form required by the Definitive Agreement had destroyed LTC's ability to compete.

46. The Claimant further contends that he resigned his shareholdings in LTC, his position as LTC Chairman of the Board, his employment relationship and his ability to assure a successful future for LTC against representations made to him within the context of the Reorganization and, especially, the receipt of the initial warrants and the attached right to recapture a significant part of his ownership of the business within the context of a public offering of LHC shares (anticipated to take place, according to the Claimant, as early as March 1988) that would secure about 6.6 % of LHC stock for the Claimant. The Claimant states that had he not obtained such warrants, he would not have entered into the Definitive Agreement.

47. The Claimant seeks the following relief for his claims:

(a) First Claim for Relief

As a result of Kyocera's wrongful failure to honor its contractual commitment to execute the ATA in the form required in the Definitive Agreement, the Claimant has been substantially injured in that Kyocera's conduct was a substantial contributing factor in the destruction of LTC which, in turn, has rendered worthless the 6.6 % interest in LHC which the Claimant was entitled to acquire. The Claimant is entitled to compensation for the direct and proximate damages resulting from such material breach of the Definitive Agreement.

(b) Second Claim for Relief

Implicit in the Definitive Agreement and related agreements was an implied covenant material to the transaction that Kyocera and Prudential would conduct the business of LTC in business like fashion. Kyocera breached such covenant by prematurely causing the collapse of LTC. Claimant is entitled to damages suffered as a direct and proximate result of such breach of the Definitive Agreement.

(c) Third Claim for Relief

Kyocera breached an implicit covenant of Good Faith and Fair Dealing under California law by concealing Kyocera's true intent as to the Agreement-in-Principle, the Definitive Agreement and the ATA through a scheme, artifice and conspiracy to defraud and deceive for the purpose of inducing the Claimant to execute such agreements, that included, without limitation (and as further detailed in the Updated Request) false and misleading statements, representations and omissions as to Kyocera's non-intention to execute the ATA as required by the Definitive Agreement. The Claimant is entitled to damages suffered as a direct and proximate consequence of such wrongful conduct by Kyocera.

(d) Fourth Claim for Relief

7

On or after 29 December 1990 Kyocera breached the Definitive Agreement and related Agreements by not supplying disk drives to LTC at 78 % of the market price. Although as a consequence of such breaches Kyocera's right to manufacture and sell disk drives based on LTC technology was extinguished, Kyocera continued to manufacture and sell such disk drives. The Claimant is entitled to damages suffered as a direct and proximate consequence of such wrongful conduct by Kyocera.

### (e) Fifth Claim for Relief

Kyocera concealed its true intent to capitalize on the weak financial condition of LTC and the frustration of Prudential in its relationship with Kyocera in order to drive LTC out of business so that Kyocera would obtain greater rights to LaPine disk drive technology and not to resolve all disputes, including those concerning Kyocera or relating to the ATA, as represented in the Agreement-in-Principle, the Definitive Agreement and the proxy statement. Had the Claimant known Kyocera's true intent, he would not have entered into the Agreement-in-Principle or the Definitive Agreement, and is thus entitled to damages as a direct and proximate result of the breach of these obligations.

### (f) Sixth Claim for Relief

For the purpose of inducing the Claimant to execute the Definitive Agreement, Kyocera actively made and perpetrated materially false or misleading statements and omissions in connection with such Agreement, and Kyocera was thus negligent with regard to the truthfulness of its representations to the Claimant, who relied on said statements and who, had he known the falsity of such statements, would not have entered into the Definitive Agreement. The Claimant has suffered damages as a direct and proximate result of the breach of this obligation for which he is entitled to compensation.

### (g) Seventh Claim for Relief

Kyocera made and perpetrated false and misleading statements, representations and omissions on Kyocera's and Prudential ability to take LHC to a successful public offering as contemplated at the time of the closing of the Reorganization. Claimant relied on such statements, and had he known about their falsity, he would not have entered into the Definitive Agreement. As a direct and proximate result of the breach of this obligation, Claimant has suffered damages for which he is entitled to compensation.

### (h) Eighth Claim for Relief

By acting negligently in the management of LTC and not resolving disputes with Prudential in a way that would not destroy LTC, Kyocera destroyed LTC and the value of the 6.6% interest in LHC that the Claimant was entitled to acquire and violated the duty under the Definitive Agreement as to the Claimant to act with care in the management of LTC at least until there was a successful public offering of LHC shares. As a direct and proximate result of the breach of this obligation Claimant has suffered damages for which he is entitled to compensation.

### (i) Ninth Claim for Relief

As a result of the Definitive Agreement, the control of LTC was transferrred to Kyocera and Prudential, so that the survival of LTC was directly dependent on Kyocera and Prudential. For that reason and other relationships with LTC, Kyocera owed fiduciary duties to act in the highest good faith towards LTC and the Claimant precluding Kyocera from obtaining benefit to the detriment of LTC and the Claimant. Such fiduciary duties were breached by the failure of Kyocera to honor its commitments under the Definitive Agreement and allowing the closing of the Reorganization to occur under circumstances likely to cause further dispute leading to the demise of LTC. As a direct and proximate consequence of such wrongful conduct, the Claimant suffered damages for which he is entitled to compensation.

### (j) Tenth Claim for Relief

Kyocera further breached an implicit covenant of good faith and fair dealing under California law by: (1) Causing the collapse of LTC for its own benefit to the detriment of the Claimant; (2) Doing nothing to preserve any value for the warrants of the Claimant; (3) Mismanaging LTC; (4) allowing the closing of the Reorganization and related agreements under circumstances that would lead to the demise of LTC; (5) failing to advise the Claimant before he signed the various agreements relating to the Reorganization that it would not sign the ATA; (6) misappropriating the LaPine disk drive techonology for its own use; and (7) failing to mitigate damages in its dispute with Prudential by supplying (and not discontinuing the supply of) disk drives to LTC at 78% of the market price and seeking damages for the difference between such price and the figure it believed justified or in the original ATA. According to the Claimant, such conduct would have saved LTC. As a direct and proximate result of Kyocera's breach of such covenant, Claimant has suffered damages for which he is entitled to compensation.

## III. The Parties' Positions and Arguments Regarding the Kyocera Motion

### a) Kyocera's Position and Arguments

48. Kyocera argues that by choosing to wait sixteen years to activate this arbitration after it was commenced on 14 December 1990, LaPine forfeited his right to pursue his claims. California has a strong public policy, embodied in statute, that requires claimants to be diligent in pursuing claims. California courts have held that this policy applies with equal if not greater force to arbitration, which is intended to provide an efficient non-judicial forum for resolving disputes expeditiously.

49. Kyocera alleges that LaPine forfeited the right to press his claims by delaying this arbitration by sixteen years. The events took place in the 1980s. LaPine filed this arbitration in 1990 for statute of limitation purposes. The final award in the Previous Arbitration was rendered in 1994 and final judicial appeal concerning the Previous Arbitration was concluded in August 2003. However, it was not until July 2005 that LaPine announced that he was ready to move on in this arbitration. Kyocera contends that under California statutory and case law: (i) LaPine was

9

required to prosecute his claims expeditiously and that he unreasonably failed to do so; and (ii) that the stays of this arbitration did not relieve LaPine from his obligation to prosecute with reasonable diligence. Kyocera seeks support for this contention in: (i) § 583.410 (a) California Code of Civil Procedure (« Cal.Code.Civ.Proc. ») vesting adjudicators with discretionary authority to dismiss a case for failure to bring it to trial within two years after the action was commenced; (b)§§ 583.310, 538.340 Cal.Code.Civ.Proc. providing that an action shall be brought to trial within five years after the action is commenced, any action not tried within five years is to be dismissed and that such five-year period is mandatory and not subject to extension, excuse or exemption « except as expressly provided by statute », i.e., when such five-year period is tolled for reasonable stays in the litigation, a lack of jurisdiction, or some event that renders prosecution impossible.

50. Kyocera relies on *Lopez v. State* 57 Cal.Rptr.2d 266,267-268 (Cal.App.1996) to dismiss LaPine's argument that Kyocera has not suffered prejudice by LaPine's delays in pursuing his action in arbitration since prejudice would inhere in this case because long delays inevitably result in dimmed memories and lost witnesses. Kyocera further asserts that it would also suffer actual prejudice should the Kyocera Motion not be granted since LaPine has for the first time, in the process of finalizing the Terms of Reference in 2006, contested the authenticity of LaPine's waiver dated 24 December 1986 (the « LaPine Waiver »), added as Exhibit 7 to the Kyocera Motion but first submitted together with Prudential's answer to the arbitration request in 1990. According to such document, LaPine would have waived that either of or both the Amended Technology Agreement and the Amended Trading Agreement be executed and delivered by the parties thereto. Kyocera argues that LaPine lacked any valid reason to await the outcome of the appeals against the award rendered in the previous arbitration and that fading recollections and the need to search for witnesses, retrieving documents and reconstructing events surrounding the LaPine Waiver and that took place twenty years ago is evidence of clear and substantial prejudice caused by LaPine inaction that Kyocera would suffer should this matter now be pursued in arbitration.

51. Kyocera also rejects LaPine's argument that the delay in continuing this arbitration was justified since decisions in the Previous Arbitration would be determinative of both the legal and factual issues in the present case. Kyocera relies on the California Supreme Court decision in *Vandenberg v. Superior Court* 88 Cal.Rptr.2d 366, 379 (Cal.1999) to deny arbitral awards collateral estoppel effects in favor of third persons unless the parties agree otherwise. Kyocera further relies on other decisions of the California courts to: (i) deny that the pendency of appeals against the award in the Previous Arbitration excuses the prolonged failure to continue the present one; (ii) contend that LaPine has not invoked additional and substantial factors weighing against the reasons invoked by Kyocera in support of its motion to dismiss; and (iii) argue that LaPine's requests for stays of this arbitration in the early 1990's, irrespective of whether such requests were or not consented by the respondents, did not release him from his duty under California law to expedite the resolution of this case.

52. Kyocera forcefully denies LaPine's argument that by excluding stays ordered in this arbitration after its commencement through the appointment of new counsel by LaPine on 29 July 2005 (between 6 July 1992 and 25 August 1994; and between 18 October 1994 and 5 February 2004) from the computation of the maximum 5-year period of procedural inactivity

allowed under §§ 583.310; 583.340 Cal.Code.Civ.Proc., such inactivity only amounts to 3 years and 6 months and, thus, that the five-year mandatory threshold would not be reached. Kyocera contends that even if such argument were accepted, procedural inactivity in this arbitration would have exceeded the two year period granting discretion to the adjudicator to dismiss the case if inactive for more than two years under § 583.410 (a) Cal.Code.Civ.Proc. and that given the extraordinary delays incurred by LaPine in the pursuit of this case and his unwillingness to push this case forward, this Arbitral Tribunal should use such discretion and grant Kyocera's motion for dismissal. Kyocera finally argues that LaPine's lack of diligence in prosecuting his claim and a policy protecting defendants from prejudicial delays outweigh any public policy considerations favoring the adjudication of the case on the merits.

53. Kyocera further relies on: (i) § 437c(c) Cal.Code.Civ.Proc. providing that summary adjudication « ...shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law »; (ii) California Supreme Court Case *Aguilar v. Richfield Co.* 25 Cal.4th 826, 850 (2001) standard according to which « there is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of a party opposing the motion in accordance with the applicable standard of proof »; and (iii) § 437 c(p)(2) Cal.Code Civ.Proc. providing that « A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action ». On such bases, Kyocera contends that LaPine having failed to state valid claims as a matter of law, such claims should be dismissed.

54. In addition, Kyocera claims that even if the allegations in the Updated Request are taken as true, LaPine's Updated Request fails to state a valid or viable claim on the merits as a matter of California law. Specifically, Kyocera contends that all of LaPine's claims are barred because: (i) LaPine lacks standing to assert them; (ii) LaPine waived all the claims advanced in this arbitration in writing; and (iii) all such claims are barred by principles of waiver and/or estoppel. Kyocera argues that any one of these three separate legal defenses stands as an independent barrier to all of LaPine's claims in this arbitration.

55. Kyocera asserts that LaPine lacks standing to pursue a claim for the lost opportunity in acquiring a 6.6. % stock interest in LHC because under California law only corporate shareholders have standing to bring a derivative suit against a corporation in which they hold shares for the loss of value of the corporation's stock. Since LaPine is not a shareholder of LHC, he lacks standing for bringing such a suit. Kyocera relies on California cases *Schuster v. Gardner*, 25 Cal. Rptr. 3d 468, 473-74 (Cal. App.2005) and *Nelson v. Anderson*, 84 Cal. Rptr.2d 753, 762 (Cal. App.1999) in support of its position.

56. Kyocera further contends that the injury alleged by LaPine as the basis for his claims is the frustrated opportunity to exercise warrants issued by LHC to obtain a 6.6% interest in that corporation's share capital and in thus sharing in the corporation's profits. Kyocera argues that under California law the holder of a contractual conversion right is only a corporate creditor not entitled to sue for injuries resulting from the frustration of such rights and destruction of value in the company. Kyocera relies, *inter alia*, on California cases *Kessler v. Gen. Cable Corp.*, 155

Cal. Rptr. 94, 100 (Cal.App.1979) and *Daly v. Yessne* 31 Cal.Rptr. 3d 420,427 (Cal. App.2005) in support of such argument.

57. Kyocera also says that LaPine's claims are barred by waiver and estoppel since LaPine accepted US\$ 1,100,000.00 for his original notes, used those monies for his other business and failed to tender back those monies or hold them in escrow. Kyocera further rejects LaPine's argument that by using or holding those monies he was mitigating damages, since such argument only applies when liability has been established, not as a tool to impose liability.

58. Kyocera rejects LaPine's argument that the LaPine Waiver is not authentic since it is based on a self-serving statement, LaPine's position has fluctuated along time (initially, he alleged not recalling having signed the LaPine Waiver, more recently he alleged not having signed it), no claim of forgery or criminal action was filed when LaPine claims to have become aware of the waiver in the late 1980's or thereafter and LaPine's theory that Prudential attorneys cut and pasted LaPine's signature on the LaPine Waiver document is implausible. Kyocera equally rejects LaPine's arguments that: (i) the entire agreement clause in Section 5 of the Definitive Agreement precludes all other agreements between the Parties (since the waiver was dated after such Agreement and the entire agreement clause only extends to the Parties' understandings and will as of the date of the Definitive Agreement); and (ii) the LaPine Waiver is ineffective because in the Previous Arbitration the arbitrators concluded that a certain LTC Waiver was ineffective (because, unlike such LTC waiver, the LaPine Waiver is not a condition precedent to other rights or obligations, and is unconditional and unreserved).

59. Finally, Kyocera pleads that LaPine's fraud claim is untimely because the three-year limitation period under California law computed since the accrual of the fraud action had run out by the date LaPine filed his arbitration request commencing the present proceedings and attributing fraudulent conduct to Kyocera. Kyocera points out that LaPine has not substantiated his naked assertion that he was not aware of his injury before March 1988 when he exchanged his notes for US\$ 1,100,000.00 in cash. Kyocera further points out that for statute of limitation purposes, such fraud claim accrued when LaPine should have known of his injury, ie., at least as early as 22 December 1986, when Kyocera wrote to LaPine and the other parties to the Definitive Agreement to inform them that Kyocera had decided not to sign a certain Amended Trading Agreement. Thus, according to Kyocera, by the commencement of these arbitral proceedings all LaPine claims in this arbitration had already prescribed.

60. In short, Kyocera requests that all Claims or relief asserted by the Claimant be dismissed under California law, policy or principles of waiver or estoppel either because: (a) the Claimant forfeited the right to pursue his claims by failing to prosecute them in a timely fashion under California law; or b) the Claimant's Updated Request fails to state a claim upon which relief can be granted because (i) the Claimant lacks standing to pursue such Claims, (ii) Claimant released such Claims in writing (and waived Kyocera's execution of the Amended Trading Agreement), and/or (iii) all of Claimant's Claims are barred under principles of waiver and/or estoppel.

61. Kyocera has also filed the following counterclaims and set-off defenses that, according to a statement of Kyocera in the Terms of Reference, are to be maintained only if this arbitration proceeds to the merits because the Kyocera Motion is rejected:

(i) Kyocera alleges that the Claimant was aware of the existence of critical design defects in the disk drives before they were discovered by Kyocera in order to induce Kyocera to agree to manufacture LTC's disk drives and invest in LTC. Despite such circumstance, Kyocera contends that the Claimant made representations concerning such drives that were false or incomplete and that the Claimant knew were false and incomplete, but were not disclosed by the Claimant to Kyocera despite his duty to do so. If the Claimant did not know about the critical defects in the drives, he acted with negligence and in all events in breach of the covenant of good faith and fair dealing that is implied in all contracts governed by California law. Kyocera alleges that on the strength of such representations of the Claimant Kyocera entered into agreements with the Claimant and third parties under which Kyocera undertook to manufacture disk drives for eventual sale through the Claimant's company LTC.

(ii) Kyocera further contends that the Claimant waived his claims in writing when he signed the Definitive Agreement. By bringing this arbitration notwithstanding such waivers, the Claimant has caused Kyocera to expend attorney's fees and other costs in the defense of this arbitration, that are recoverable by Kyocera as damages for LaPine's breach.

(iii) Kyocera also claims that the Claimant has breached the implied covenant of good faith and fair dealing under California law by bringing this case after receiving payments exceeding US$ 1.1 million in exchange for his original notes in order to obtain compensation for such original notes a second time.

(iv) Kyocera requests that it be awarded damages on its counterclaims and/or set-offs, estimated at the moment of executing the Terms of Reference in the amount of at least US$ according to proof, which are expected to be at least US$ 5 million if measured by out-of-pocket costs, and much greater if measured by the extent to which Claimant's actions and inactions diminished the value of Kyocera's investment and profits attributable to the investment.

b) LaPine's Position and Arguments.

62. LaPine argues that more than 90% of the delay after the filing of this arbitration occurred because of the pendency of the Previous Arbitration and the concurrent views of all the parties and the Arbitral Tribunal that the commencement of this matter should await a final award in the Previous Arbitration. Kyocera chose, as is its right, to challenge and appeal that award all the way to the United States Supreme Court. The Claimant, however, should not be denied his day in court because all parties and the Arbitral Tribunal hearing the present case chose the path of efficiency.

63. LaPine further states that while it is the policy in California that a plaintiff proceed with reasonable diligence in the prosecution of an action, it is also the policy of California that all parties must cooperate in bringing the action to disposition (Cal. Code of Civ. Proc. §583.130).

The parties have cooperated in bringing this matter to disposition by unanimously agreeing about the timing of the commencement of this arbitration. Furthermore, the policies favoring: (i) the rights of the parties to make stipulations in their own interest; and (ii) disposition of an action on the merits are generally to be preferred over the policy requiring dismissal for failure to proceed with reasonable diligence.

64. LaPine points out that California Rule of Court 373(e) requires that when ruling on a motion to dismiss for delay, a court must consider "the pendency of other litigation under a common set of facts or determinative of the legal or factual issues in the case." This arbitration was stayed for 14 years precisely because of the pendency of another arbitration involving a common set of facts and determinative of both the legal and factual issues in this case.

65. In light of all the facts and circumstances, the Claimant says that he proceeded with reasonable diligence. Between December 1990, when the Claimant filed his claim in the present arbitration, until February 2004, the Claimant did all he could to prosecute his claim. This arbitration was stayed until February 2004 (while Kyocera unsuccessfully defended and appealed the related prior arbitration), and said stay was ordered by the Arbitral Tribunal with the unanimous consent of all the parties including Kyocera. After then, LaPine alleges that he attempted to locate his counsel of record, who had been disbarred for, *inter alia*, failing to communicate with his clients, and thereafter retained new counsel, who appeared in this matter on Claimant's behalf in July 2005. Under the rules governing dismissals for delay, and the policy articulated in California's Code of Civil Procedure, Kyocera's motion to dismiss for failure to prosecute must be denied.

66. LaPine further contends that Kyocera's standing argument depends wholly on its characterization of the Claimant as a warrant holder, and ignores his capacity as a signatory and party to a contract that Kyocera breached. As such, the Claimant can sue Kyocera for the harm caused to him by Kyocera's breach – the Claimant's status as a warrant holder is irrelevant to that standing. Here the Claimant relied on Kyocera to his detriment by giving up his 29% interest in LTC in return for the opportunity to acquire a 6.6% interest in LHC. Kyocera's breach destroyed that opportunity and eliminated the consideration for which Claimant had bargained. That the opportunity was contingent does not alter Kyocera's culpability or its obligation to pay damages that resulted from its breach. Furthermore none of Kyocera's authorities supports its suggestion that Claimant lacks standing as a party to the Definitive Agreement to bring a claim for damages caused by a breach of that Agreement.

67. LaPine also points out that he did not release and has never released any claim against Kyocera for Kyocera's breach of the Definitive Agreement. As Kyocera acknowledges, the Definitive Agreement, at Section 8.9(b) specifically reserves from Section 8.9(a)'s release any claim for a material breach of the Definitive Agreement. The tribunal in the Previous Arbitration found that Kyocera breached the Definitive Agreement, and that the breach was material. In order to avoid the impact of those findings, Kyocera weakly argues that another writing (the LaPine Waiver), never mentioned in the Definitive Agreement, constitutes a waiver of the protections of Section 8.9(b). The Claimant asserts he never waived the protections of Section 8.9(b), while Kyocera ignores the fatal flaw in its waiver argument – the "Entire Agreement" provision embodied in Section 8.5 of the Definitive Agreement limits the entire agreement

14

between the parties to the terms in the Definitive Agreement and in those agreements, documents and instruments referred to in the Definitive Agreement. LaPine argues that Kyocera does not – because it cannot – direct the Arbitral Tribunal to any reference to this so-called waiver in the Definitive Agreement. There is no such reference and thus the Claimant concludes that he never waived his claims against Kyocera for breach of the Definitive Agreement.

68. Similarly, LaPine contends that the three-year statute of limitations for fraud and negligent misrepresentation does not bar the Claimant's fraud and negligence claims. As Kyocera notes, the running of that three-year statutory period is governed by the "discovery rule." The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of its injury and its negligent cause. Here the Claimant was not aware of his injury until March 1988 when he was required to make his election to acquire warrants for his original notes and he was told at the time the warrants would be worthless as a result of Kyocera's actions. Thus his December 1990 filing of the arbitration request originating the present arbitration was timely and his fraud and negligence claims are not time-barred.

69. When the Claimant made his decision in 1988 to exchange his original notes for cash, he was under a duty, as are all breach of contract victims in California, to mitigate the damages he suffered as a result of Kyocera's wrongful conduct. As he had been told at the time of the election that the final warrants would be worthless, he mitigated his damages by electing the only true vehicle available to him at the time – exchanging his original notes for cash. To suggest that by mitigating his damages, the Claimant waived his claims is unsupported by the facts and the law.

IV. Findings and Determinations of the Arbitral Tribunal.

70. The Kyocera Motion raises two different sets of issues that Kyocera has articulated essentially from the perspective of California statutory law and cases. The first one is whether by LaPine failing to continue to push his claims in this arbitration during, as the case may be, two or five years after commencement of the arbitral proceedings, this Arbitral Tribunal should dismiss the Claimant's case. The second one is whether the Claimant's claims should be summarily dismissed because of failure by the Claimant to: (i) state a valid claim as a matter of law; and (ii) prove the existence of genuine and material disputed factual issues needing determination for deciding on the Claimant's claims. The Arbitral Tribunal shall consider these two distinct sets of issues in the order formulated by Kyocera.

a. Failure to Activate the Arbitral Proceedings in accordance with California Statutory Law.

71. The Parties have extensively argued for and against the dismissal of the Claimant's claims for failure to timely prosecute this case under California law. However, during the Hearing, in response to questions from the Arbitral Tribunal, Kyocera and LaPine counsel presented different views as to the rules governing the determination of whether failure to prosecute in arbitration leads to the dismissal of the Claimant's claims. Whilst Kyocera's counsel made the argument that the reference in the arbitration agreement to the laws of California and to San Francisco, California as the seat of the arbitration renders California law applicable to such determination and privileges the application of California public policy, LaPine's counsel took

the opposite position and argued that although California law governs the dispute on the merits, it does not control procedural matters or matters concerning the conduct of this arbitration, such as the alleged failure by LaPine to timely pursue his case in arbitration[1].

72. The Arbitral Tribunal is of the view that such issue is a procedural, and not a substantive law, issue. Although the arbitration clause does not expressly indicate that the ICC Rules govern this arbitration (it only says that the three arbitrators shall be appointed by the Court of Arbitration of the ICC) it is undisputed that this arbitration is entirely subject to the ICC Rules. It was set in motion by the ICC Court in accordance with such Rules without any objection from any party to the proceedings, and has been conducted by the Arbitral Tribunal and administered by the ICC Court and its Secretariat in accordance with such Rules. It should equally be borne in mind that the Terms of Reference (para. 10 at page 10) provide that the applicable rules of procedure for this arbitration are the ICC Rules.

73. However, the ICC Rules, rendered applicable by the will of the Parties, do not necessarily govern all matters regarding the conduct of an ICC arbitration: other rules may also govern to the extent the ICC Rules or the parties to the reference in case of gaps in the ICC Rules remain silent. Accordingly, Article 11 of the ICC Rules recites as follows:

*« The rules governing the proceedings before the arbitrator shall be those resulting from these Rules and, where these Rules are silent, any rules which the parties or, failing them, the arbitrator may settle, and whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration »*

74. It is then for the Arbitral Tribunal – should it conclude that the ICC Rules are indeed silent on the dismissal of an ICC arbitration for failure to prosecute – to establish such matters. As it will be shown below, the Arbitral Tribunal is of the view that the ICC Rules are not silent in this respect. Further, the Arbitral Tribunal finds that the policies underlying the ICC Rules substantially differ from most of those purportedly underlying the California statutory provisions that have been brought to bear in this case in connection with the failure to prosecute claims in arbitration, or that the ICC Rules assign different weight than Californian law to potentially competing policies in that regard.

75. According to Kyocera, three features characterize California public policy underlying such statutory provisions. The first one is that the plaintiff bears the burden of pursuing its case[1]. The second one is to protect the defendant by not exposing it to delays in the adjudication of the case adversely affecting its ability to present and defend its case[2]. The third one is that such policies apply to arbitrations as well[3]. Without denying or contesting such policies, LaPine in turn points

---

[1] Hearing transcript, at 124-126.

[2] Hearing transcript, at 14.

[3] Hearing transcript, at 16.

[4] Hearing transcript, at 16.

out that the policy of protecting the defendant against prejudicial delay is outweighed by the policy of favoring trial or disposition of claims on the merits and that such dismissal statutes were intended as a device aimed at « clear[ing] trial court calendars »'. Kyocera has not refuted LaPine's assertion that such policies are also at the background of such statutes.

76. The ICC Rules do not have provisions, nor is there a policy inherent in the spirit of the ICC Rules (Article 26) favoring claimants over defendants or preferentially imposing any duties or burdens on any of them when it comes to activating arbitration procedures. On the contrary, the ICC Rules are quite explicit in ensuring that arbitral proceedings are to continue irrespective of either party failing to participate in the arbitration. In this respect, Article 8(2) of the ICC Rules recites as follows:

*« If one of the parties refuses or fails to take part in the arbitration, the arbitration shall proceed notwithstanding such refusal or failure »*

77. The ICC Rules thus clearly favor the continuation of the arbitral proceedings until obtaining an award on the merits irrespective of whether it is the claimant or the respondent who fails to prosecute. Once ICC arbitral proceedings are set in motion, the primary objective of the ICC Rules is to permit the Parties to reach an award settling the dispute on the merits. Indeed, the ultimate purpose of the ICC Rules is to ensure, except for the very exceptional circumstances that will be described later on, the continuation of the arbitral proceedings until reaching a final award on the merits. Thus, it should be understood that the parties had in mind such ultimate purpose when executing an arbitration agreement referring to ICC arbitration, and that in exchange for seeing such purpose fulfilled, not only did the Parties submit to the ICC Rules, but also accepted to pay the administrative and arbitral fees required thereunder to obtain a final, binding and enforceable award (Article 24 ICC Rules) . Thus, from the ICC Rules perspective, both Parties are considered equally interested in – and burdened by – the activation of arbitral proceedings until an award on the merits is obtained. Such objective is privileged over other policies or objectives underlying the ICC Rules. This is reflected by the ICC Rules provisions on the sharing and payment of cost and arbitral fees advances, as will be shown further below.

78. Under the ICC Rules, a failure to prosecute by the claimant– even through an extended period of time – does not lead to the dismissal of any of the parties' claims, defenses or counterclaims, so long as any party manifests an interest in maintaining the proceedings alive. It is true that ICC Rules Article 13 (2) provides a two-month period for drawing up terms of reference and ICC Rules Article 18 (1) provides six months after execution or approval of the terms of reference for rendering the award. However, as stated in the leading commentary of the ICC Rules of Arbitration, such delays are regularly extended by the ICC Court save in those *« rare instances where the parties have lost interest in the proceedings or otherwise disappeared »'* or those cases *« ....in which neither party has expressed an interest in the continuation of the proceedings »'*.

---

' Hearing transcript, at 65.

' Y. Derains & E.Schwartz, A Guideline to the ICC Rules of Arbitration (2nd Edition 2005) at 261. Although this commentary refers to the 1998 ICC Arbitration Rules presently in force, the

79. The present case is an eloquent confirmation of such practice, as evidenced by the continuous extensions by the ICC Court of delays for finalizing terms of reference and the rendition of an award on the merits and the consultations of the Court Secretariat with both Parties to find out their positions regarding the continuation of the arbitration despite the inactivity of the Claimant to go forward. Such extensions and consultations (and the absence of any decision not to extend the delays for submitting terms of reference to the ICC Court or rendering an award on the merits) denote that the ICC Court did not reach the conclusion that both Parties had lost an interest in continuing the proceedings or in keeping them extant. Rather than imposing on claimants any specific burden to maintain the proceedings alive or privileging the interests of the respondents in a prompt adjudication of the case, such practice commands establishing whether *both* parties wish to terminate the proceedings or not.

80. Absent an agreement to terminate, the proceedings remain alive and the ICC Court will extend the delays for making an award on the merits.

81. The provisions of the ICC Rules on sharing and funding cost and fees advances are a corroboration of the above and prove that the only situation under the ICC Rules (except for an explicit agreement of the parties or an exceptional decision of the ICC Court not to extend delays for finalizing terms of reference or rendering the award because *none* of the parties signified its interest in continuing the arbitration) permitting to put an end to the ICC proceedings for failure to prosecute is when it translates into a failure to honor the obligation to pay for arbitral cost and fee advances required by the ICC Court in accordance with the ICC Rules. However, the ICC Rules do not put any specific burden on claimants or respondents in making such payments, since both are afforded equal opportunity to pay an equal share of such advances and to pay the entire advance should any of them fail to pay its share (Article 9 (2) of the ICC Rules). Once the file transmitted to the arbitrators if the first half of the cost advance has been paid', the only element permitting to put an end to the arbitration through the compulsory withdrawal of claims in such scenario – as provided in Section 15 of the Internal Rules of the International Court of Arbitration set out in Appendix II of the ICC Rules - is the failure to pay the remaining part of the advance in its entirety. If the claimant fails and the respondent does not pay the entire advance, the claimant's claims are withdrawn without prejudice. No consideration (such as delay in prosecuting the proceedings and its adverse consequences for any party's case) other than the lack of payment of the advance within the time limits fixed by the ICC Court in accordance with the ICC Rules is taken into account in the process of deciding on ending the proceedings or not under such provisions.

---

ICC arbitral practices presented in the book were already in place when the earlier ICC Rules were in effect.

˙ *Ibid.* at 305-306.

ˈ Since 1986 the Court Secretariat practice regarding Article 9 of the ICC Rules was to require payment of half of the cost advance prior to the transmission of the arbitral file to the arbitrators: Y. Derains and E. Schwartz, A Guide to the New ICC Rules of Arbitration, at 306 (1st Edition, 1998).

82. In the present case, however, the cost and fee advances fixed by the ICC Court have been paid in their entirety and, for that reason, there is no room left under the ICC Rules to put an end to this arbitration for lack of prosecution of the case. The Arbitral Tribunal would only be able to entertain an application for dismissal for lack of prosecution by the claimant in this latter scenario if the claimant had failed to pay its share of the advance on costs and the respondent had made up for the claimant's shortfall and paid in the entire amount. However, in the present case the Claimant has paid for the entire share of the cost advance[*]. Since the prevailing policy in ICC arbitration is that an ICC arbitration is to be continued until the making of a final award on the merits except for the express contrary will of the parties or objective and unequivocal evidence that none of them is interested in the continuation of arbitral proceedings, for example by not paying its share of the cost advance to cover arbitral fees and expenses, and none of such circumstances is present in this arbitration, the Arbitral Tribunal is not prepared to dismiss these arbitral proceedings for lack of prosecution by the Claimant. Although Kyocera appears to refer to California public policy to reach a different conclusion, it has not provided any argument permitting the Arbitral Tribunal to conclude that such public policy overrides policy considerations embodied by the ICC Rules freely chosen by the Parties to govern this arbitration, or that such California public policy reaches out to international arbitrations dealing with strictly commercial matters taking place in California.

83. Summing up, there is no gap or absence of policies in the ICC Rules regarding dismissal of claims for lack of prosecution and no room for privileging the application of or subsidiarily applying California law provisions on the failure to prosecute arbitral claims to the present arbitral proceedings. Such dismissal may only take place under the controlling ICC Rules as described. Such conclusion is indeed in keeping with the international nature of ICC arbitrations in general and this arbitration in particular (involving a US citizen as Claimant and a Japanese corporation as Respondent) and with the objective underlying the ICC arbitration system of upholding the cultural neutrality of proceedings and, for that reason, of isolating ICC arbitral proceedings from the local laws of procedure of the arbitral seat.

84. Outside the exceptional and narrow reasons for dismissal under the ICC Rules described above, ICC arbitrators lack authority to dismiss arbitrations for failing or delaying prosecution of arbitral claims under the ICC Rules. Indeed, should they exceed their authority in that respect or in other respects, they would be acting beyond their mission and the boundaries of their powers and, as highlighted by the Arbitral Tribunal during the Hearing, these arbitral proceedings are also conducted under the Federal Arbitration Act, the grounds for vacatur of arbitral awards of which specifically apply to awards rendered in this arbitration pursuant to a specific provision of the arbitration agreement on which these proceedings are based[10]. Thus, the Kyocera Motion is to be dismissed to the extent based on the failure of the Claimant to prosecute its claims in this arbitration.

---

[*] Derains & Schwartz, op. cit. *supra*, fn. 6, at 111.

[10] Hearing transcript at 124.

b) <u>LaPine's Failure to State a Valid Claim as a Matter of Law or Raise Genuine and Material Disputed Factual Issues.</u>

85. In its communication to the Parties of 11 April 2007 the Arbitral Tribunal provided guidance on the standards (the « Standards ») it would apply to decide on the Respondent's application for summary judgment disposal on the merits of the Claimant's claims and requested and received submissions based on the Standards. The Standards are as follows:

1. *Summary judgment may be granted when the claim and response, admissions, uncontested documents and facts and affidavits in evidence show that there is no genuine issue of material fact and the moving party is entitled to an award as a matter of law.*

2. *Affidavits relied on by either Party must be made on personal knowledge, setting forth facts that would be admissible in evidence by the Arbitral Tribunal, and showing affirmatively that the affiant is competent to testify to them.*

3. *A Party opposing summary judgment may not rely on the mere allegations or denials of his claim or response but must show that there is a genuine issue for trial by affidavits or other evidence of the character referred to above.*

86. The Arbitral Tribunal will rely on the Standards to decide on the part of the Motion seeking summary judgment disposal on the merits. It is to be noted that the Parties have expressly accepted the Arbitral Tribunal's jurisdiction to do so. It should be added that providing for summary disposal on the merits of claims when the conditions to do so are met is fully compatible with both the letter and spirit of the ICC Rules requiring, among other things, the elaboration by the arbitrators at an early stage of the proceedings of Terms of Reference identifying claims and controverted issues raised by the parties (Article 13 of the ICC Rules) and the establishing by the arbitrators, necessarily against the backdrop of such claims and issues and by resorting to all appropriate means, of all facts relevant to the case at stake within as short a time as possible (Article 14(1) of the ICC Rules).

(i) <u>Claimant's First Claim for Relief</u>

87. Kyocera did covenant to advise on any event that could be reasonably foreseen as having a material adverse effect on carrying out its obligations to consummate the transactions covered by the Definitive Agreement (Section 5.4 (a) of the Definitive Agreement). Kyocera apparently did comply with such requirement by notifying, among others, LTC and LaPine by letter (the « Kyocera Letter ») dated 22 December 1986. However, LaPine contends in the Claimant's Further Submission that he never received the Kyocera Letter prior to the date on which the closing actually took place (29 December 1986). Nevertheless, the letter is addressed to a number of addressees including Mr. LaPine personally and Mr. LaPine as Chairman of LTC", with a copy also to LTC's counsel, who appears at times to act also in his (LaPine's) personal interests, and there is nothing in the record beyond LaPine's own assertion. Further, as properly

---

" By then, LaPine was still Chairman of LTC's board, Claimant Response, at 10.

20

pointed out by the Respondent, LaPine does not deny the authenticity of the Kyocera Letter, nor entirely deny having received it, but only with qualifications. It was received by counsel for the Prudential Respondents and included as Exhibit 9 in their Answer of 24 June 1991 in this proceeding, where they asserted it for the same purpose as the Respondent here (Answer pp. 5-6) when evidence might have been available if the mailing of it to any of its addressees were challenged. prior to the closing date. Given the fact that over 20 years have elapsed since the events under consideration would have taken place, it would be both unrealistic and unfair to require the Respondent to obtain or join further evidence in this respect or to prove that the contents of the Kyocera Letter were orally transmitted to LaPine. For these and the further reasons below, the Arbitral Tribunal concludes that there is no genuinely disputed and material issue of fact in this connection.

88. The Claimant argues that, had he known of Kyocera's intentions, he could and would have prevented the closing. Whether or not he could have done so, the assertion that he would have done it is not a fact of which evidence can be taken but a mere self-serving prophecy. Moreover, if he had done so, there would have been no contract on which he could base his present claim and any damages he could then have claimed would have been based on his alternative prospects that the record shows were dim and would have been too speculative to be received in evidence. Finally, the ATA was effective by virtue of the Definitive Agreement, without Kyocera's signature, as held by the arbitral tribunal in the Previous Arbitration, and the damage of which the Claimant complains was done by Kyocera's later failure to perform rather than by its failure to sign. In view of the above and the circumstances further considered in para. 105 of this Final Award, the Claimant's First Claim for Relief shall therefore be summarily denied.

(ii) <u>Claimant's Third, Fifth, Sixth and Seventh Claims for Relief.</u>

89. The Arbitral Tribunal will now examine whether the Claimant's fraudulent misrepresentation claims may be summarily disposed of on the merits, i.e., the Claimant's Third, Fifth, Sixth and Seventh Claims for Relief (see para. 47 of this Final Award). It will do so by examining in the first place whether the Standards have been satisfied or not by the Claimant opposing summary judgment. This requires examining in particular the Claimant's Further Submission and accompanying documentation and affidavits.

90. The Arbitral Tribunal observes that, in such connection, the Claimant has attached to his Further Submission a number of documents in support of his objections to the granting of the Kyocera Motion. The Claimant particularly relies on: (i) a Proxy Statement of LaPine Technology Corporation (LaPine Exh.O) reproducing the allegedly fraudulent misrepresentations in the Definitive Agreement whereby Kyocera would have induced LaPine to enter into the Definitive Agreement, and having as its purpose to pesuade the shareholders to sign proxies to implement  the approval of the Definitive Agreement and the Reorganization before the California Department of Corporations; (ii) a notice of the hearing to be held at the California Department of Corporations to consider the approval of LHC's application for the Reorganization and issuance of notes/warrants inherent to it, dated 19 November 1986; and (iii) the transcripts of the hearing that took place on 1 December 1986 at the California Department of Corporations.The application was made by LHC, which was represented at the hearing to be « *a wholly-owned subsidiary of PBTC* » (Tr. P. 5, II, 14-15,ll. 1-6)). During the hearing, the

presentation of the merger and the Reorganization was made on behalf of LHC by counsel of record for PBTC (Prudential), who mentioned the product financing arrangements under the new ATA (Tr. Pp. 15-16, LaPine Exh. N). The Proxy Statement contains the uncontested statement that two Directors (LaPine and [another] had already « *granted irrevocable proxies to PBTC authorizing PBTC to vote their 2,967,053 shares (35.9%) in favor of the Plan* » (LaPine Exh.O, para D12). Kyocera does not appear as a party to, or involved in, the Proxy Statement or the application

91.  The Claimant contends that by refraining to raise the intended changes to the ATA (and maintaining representations regarding the ATA set forth in the Definitive Agreement and the Proxy Statement) during the hearing Kyocera acted fraudulently. The Respondent denies the existence of fraudulent conduct attributable to Kyocera and further points out that the issuance of the Proxy Statement and related proceedings before the California Department of Corporations took place after the execution of the Definitive Agreement.

92. In the terms of the Definitive Agreement, Kyocera did not make any representations regarding the ATA (Section 4.4.), nor that the draft documentation attached to the Definitive Agreement would be free from change. As indicated above (para. 87), Kyocera did covenant to advise on reasonably foreseeable adverse material changes negatively affecting performance of its obligations to consummate transactions covered by the Definitive Agreement and apparently comply with such covenant by notifying through the Kyocera Letter of 22 December 1986 (i.e., after the hearing at the California Department of Corporations mentioned before but prior to the closing date foreseen in the Definitive Agreement of 31 December 1986 for the transactions covered by it (Section 2.6. of the Definitive Agreement)) that there was a significant variation in the amended ATA from the terms of the Agreement in Principle, and that Kyocera did not execute the amended ATA at the pre-closing held on 18 December 1986 nor intended to do so at the closing.

93. The remaining documentation joined by the Claimant to his Further Submission is either irrelevant on its face in connection with the Claimant's fraudulent misrepresentation or fraud in the inducement claims, or does not permit the Arbitral Tribunal to sustain a *prima facie* case in connection with such claims based on genuine and material disputed facts. In the Claimant's Further Submission there is no list of or affidavits from possible fact witnesses who would testify in support of the Claimant's case for fraudulent inducement. As to the Claimant's application for further discovery of documents based on Brooke E. West's affidavit joined to the Claimant's Further Submission, it should be noted that out of additional 34 documents that, according to such affidavit, could be relevant for rejecting the Motion, 28  were spontaneously joined to the record by the Respondent together with the Respondent's Further Submission after a search in the offices of Morrison & Foerster L.L.P., the custodian of Kyocera's records concerning the Previous Arbitration[ii]. The Arbitral Tribunal has examined such documents and been unable to identify genuinely material disputed issues of fact as to Kyocera's alleged fraud-in-the inducement conduct or their relevance in such connection. As to the remaining 6 documents, the Respondent has clearly indicated in its Further Submission that they either do not exist or are not in Kyocera's possession. Brooke E. West's affidavit does not provide any information as to

---

[ii] Affidavit of Shannon M. Nestor of 22 June 2007.

where or under whose control such documents – if at all existing - could or would be. As taken into account by the Arbitral Tribunal in the general process of analyzing and concluding on the Kyocera Motion, such circumstances eloquently reveal once more the daunting evidentiary difficulties to be met if this case were tried on the merits after having been dormant for over twenty years and the absence of even a *prima facie* record permitting that to happen.

94. In his Further Submission the Claimant indicates that the Standards provided by the Arbitral Tribunal should be supplemented with additional standards drawn from California law. In the view of the Claimant, it will suffice for the Kyocera Motion to be denied if there is one single material fact in dispute and the Respondent (movant) fails to prove that the opposing party (Claimant) cannot reasonably obtain evidence to support its case. In such scenario (the movant failing to join such proof), the party opposing the motion does not need to present opposing evidence and its mere allegation of material controverted facts would be sufficient for the motion to be dismissed". The Arbitral Tribunal disagrees.

95. As previously indicated in this Final Award, this arbitration is international in nature, and although venued in California, is not subject to Californian procedural law not standing for core Californian public policy. For this reason, the Arbitral Tribunal does not deem itself bound by California statutes or case law regarding summary judgment disposal on the merits of the case. Rather, precisely because of their international nature, the *lex arbitri* governing these arbitral proceedings is primarily the U.S. Federal Arbitration Act. Should the Arbitral Tribunal seek guidance in the *lex arbitri* to determine standards regarding summary judgment, it would naturally look to the Federal Rules of Procedure (Rule 56). As admitted by the Claimant, under U.S. federal law, « *....the moving party's burden is satisfied if he can point to an absence of evidence to support an essential element of the non-moving party's claims* »". Therefore, the Standards are fully in line with the Federal Rules of Procedure standards regarding summary judgment disposal and the Claimant's arguments to supplement the Standards may not be accepted.

96. In absence of factual proof joined by the Claimant showing genuinely existing and material disputed issues of fact regarding fraudulent misrepresentations or inducement conduct attributable to Kyocera, the Arbitral Tribunal is then only left with LaPine's allegations as to the existence of such conduct in his affidavit joined to the Respondent's Further Submission dated 17 May 2007. However, for the reasons given above, the Arbitral Tribunal rejects the Claimant's contention that the Respondent must join evidence to show that the Claimant's claims are not supported by material facts and, accordingly, that since the Respondent would have failed to join such evidence, the Claimant's mere assertion of disputed issues should suffice to reject the Kyocera Motion in that respect.

97. The Respondent alleges as additional support for the Kyocera Motion and as an undisputed issue of law and fact that the three-year statute of limitations period for claims of fraud and negligent misrepresentation under Cal.Civ.Pro.Code § 338 (d) (computed backwards as from the

---

" Claimant's Further Submission, at 3-5.

" Claimant's Further Submission, fn. 1 at 3.

arbitration request's filing date of 14 December 1990) has elapsed and bars the Claimant's fraud claims". The Arbitral Tribunal observes that the ICC Rules do not contain statute of limitation provisions and that both the *lex fori* and the law governing the substance of the Definitive Agreement and related company merger and reorganization documentation is California law. Therefore, the Arbitral Tribunal has no hesitation in concluding that statute of limitations issues regarding the merits of the Claimant's claims are governed by Cal.Civ.Pro.Code § 338(d), as indeed pleaded by both Parties.

98. As pointed out by the Respondent in its Further Submission, LaPine has not denied receiving the Kyocera Letter prior to 14 December 1987 (i.e., prior to the commencement of the three-year statute of limitations period between such date and the filing date of this arbitration on 14 December 1990). Other facts mentioned in the Claimant's Updated Request (a 7 May 1987 law suit filed by LTC against Kyocera and LTC's June 1987 notification of the termination of the interim technology and trading agreements"") strongly militate in favor of concluding that, indeed, LaPine knew or should have known about any allegedly fraudulent conduct of Kyocera relating to the execution of the Definitive Agreement and ensuing or connected effects before 14 December 1987. Before such date, LaPine knew or should have known about or at least should have suspected the existence of Kyocera's alleged wrongdoing, and thus should have been incentivized to sue since the date of the Kyocera Letter. However, LaPine failed to then investigate the facts on which his legal suit would be based and diligently proceed to file it, as he should have in accordance with California law (Supreme Court of California, *Jolly v.Elli Lilly & Co.*, 44 Cal.3d 1103, 751 P.2d 923, at 1111).

99. The Arbitral Tribunal does not accept the Claimant's argument based on *American Pipe & Construction Co. v. Utah* (414 U.S. 538 (1974)) that the statute of limitations applicable to his fraud claims was tolled during the pendency of the class action initiated by former LTC shareholder Thomas Evans against Kyocera".

100. The Claimant states that on 23 November 1987 Thomas Evans filed a class action against Kyocera on behalf of himself and all other former LTC shareholders, including LaPine. In his class action, Mr. Evans asserted that Kyocera had committed fraud by failing to disclose in the Proxy and elsewhere that it would not sign the ATA. This class action was dismissed on 22 July 1988. On the basis of *American Pipe*, the Claimant contends that any statutes of limitations applicable to the claims asserted in the Evans class action were tolled for the benefit of all members of the proposed class during pendency of the litigation. Since the Evans case was pending for eight months, the Claimant had until 26 January 1991 to file his fraud claims.

101. In *American Pipe* the U.S. Supreme Court held that if class certification is denied for failure to satisfy the numerosity requirement set forth in rule 23(a)(1) of the Federal Rules of Civil Procedure (the class is so numerous that joinder of all members is impracticable), the statute of

---

" Kyocera Motion, at 33.

" Updated Request, N° 25-27, at 13-14.

" Claimant Response, at 33 (fn.3); Claimant's Further Submission, at 13-14.

limitations is tolled from the time of commencement of the suit to the time of denial of certification for all purported members of the class who either make timely motions to intervene in the surviving individual action or who timely file their individual action.

102. However, in the *Jolly v. Eli Lilly & Co* decision quoted above (that denied the application of *American Pipe*) the Supreme Court of California held (at 1119) that:

*« Although we are not bound by the United States Supreme Court decisions (....) we nevertheless consider the applicability of American Pipe »*

Thus, this Arbitral Tribunal, although bound to apply California law to statute of limitations matters going to the merits of the dispute, is not bound by the *American Pipe* precedent. Be it as it may, the Evans case was dismissed because it settled out of court and did not present the numerosity requirement issue dealt with in *American Pipe*. Consequently, there is no basis for applying *American Pipe* to the Claimant's fraud claims in this arbitration, and the Claimant's claims for fraudulent conduct attributed to Kyocera are time-barred in accordance with Cal. Civ. Pro. Code § 338(d).

103. For the reasons set forth in paras. 90-101 above, the Arbitral Tribunal concludes that the Claimant's claims for fraudulent misrepresentations or fraud in the inducement attributed to Kyocera fail to state or raise a valid matter of law and do not raise or require determination of genuinely relevant and material disputed factual issues. Therefore, the part of the Kyocera Motion regarding such claims is to be granted and, accordingly, the Claimant's Third and Fifth, Claims for Relief shall be summarily denied.

104. For the reasons set forth in paras. 90-96 above and because the misrepresentations alleged are essentially those of the fraud claims and are similarly unsupported by any evidence, the Claimant's Sixth and Seventh Claims for Relief shall be also summarily denied.

(iii) Claimant's First, Second, Fourth, Eight, Ninth and Tenth Claims for Relief.

105. In dealing with these claims, it is appropriate first to consider what was the Claimant's position as a party to the Definitive Agreement and the nature of the agreement as establishing joint or several rights and obligations. The Definitive Agreement was among eight parties, of whom the Claimant was one, among whom there were various relationships and not two of whom were situated alike in respect of all their rights and duties, for the reorganization and merger of corporations and compensation of shareholders, the settlement of certain past accounts and the making of new financing arrangements, rights to use technology, manufacture and marketing of products, and related matters. California courts analyze such contracts under the usual common law rules of joint and several contracts to determine which parties are owed duties by others:

*Where two or more parties to a contract promise separate performances, to be rendered respectively by each of them, or where each of them makes only a separate promise that the same*

*performance shall be rendered, each is severally bound for the performance which he promises, and is not bound jointly with any of the others*[n]

The Claimant was a necessary party to the Definitive Agreement because he was to receive under it a valuable Consulting Agreement in which the obligors were to be only LTC and PBTC (Prudential) (Definitive Agreement, Exh.N). It would not be reasonable to suppose that he was made a party to acquire *qua* shareholder non-derivative rights against Kyocera jointly with LTC and the Prudential parties that the other shareholders did not have. It follows that he had no rights to performance after the closing other than those due to him from LTC and PBTC (Prudential) under the Consulting Agreement and those due from LHC to all shareholders, and from the evidence it appears that he received full performance of all those duties in accordance with the Definitive Agreement.

106. As to the Claimant's Second, Fourth, Eighth and Ninth Claims for Relief, the Respondent argues that, as a matter of law, the Claimant lacks standing to sue on such Claims for Relief. Essentially, the Respondent contends that: (a) the only injury asserted by the Claimant is the frustrated opportunity to purchase a 6.6% interest in LHC and sharing in the fruits of a successful corporation; (b) under California law the holders of conversion rights may not sue for injuries resulting from the alleged frustration of conversion rights and destruction of value of the company, since they are treated as corporate creditors lacking standing to assert such claims[n]; and (c) under California law, a stockholder's claims arising out from the alleged diminution in value of a company's shares must be brought as a derivative, and not as an individual, action. LaPine lacks standing since he pursues in this arbitration an individual action for the compensation of damages allegedly suffered by him and not a derivative action for the benefit of LTC or LHC for damages caused to it by Kyocera.

107. Besides rejecting such position and arguments of Kyocera, the Claimant essentially denies lacking standing to sue since: (a) his claims are based on the breach by Kyocera of the Definitive Agreement and not on his capacity as holder of notes, warrants or, eventually, shareholdings in LTC or LHC share capital[n]; and (b) his claims being asserted directly by him because of damages arising out of contractual breach by Kyocera, Kyocera's allegations that he should have filed a derivative action for the benefit of LHC are meritless[n].

108. The Arbitral Tribunal observes that, save in connection with the Claimant's claims based on Kyocera's fraudulent conduct (already summarily disposed of by the Arbitral Tribunal), the Claimant is exclusively seeking damage compensation for: « *...the loss in the value of the 6.6 %*

---

[n] Restatement of Contracts § 113 as quoted in *Freeman v. Jergins*, Cal. App.2d 536, 562, 271 P.2d 210, 227 (1954); *Douglas v. Bergere*, 94 Cal. App. 2d 267, 270, 210 P.2d 727,729-30 (2d Dist. 1949).

[n] Kyocera Motion, at 24-27; Respondent Reply, at 14.

[n] Claimant Response, at 26-28; Claimant Further Submission, at 22-23.

[n] Claimant Response, at 29.

*interest in LaPine Holding he would have acquired but for Kyocera's breach which destroyed LaPine Technology »*[22]. Indeed, all of such Claimant's claims for damages originate in the misappropriation of LTC technology, the mismanagement of LTC, the damage caused to LTC's business, including those resulting from its final collapse; i.e., in damages directly inflicted to or suffered by LTC. The Arbitral Tribunal also notes that, consonant with the way the Claimant has fashioned such claims, the Claimant's rights under the Definitive Agreement exclusively consist of receiving notes exchangeable for warrants in turn swappable for LHC shares.

109. Under California law, note or warrant holders are considered mere creditors of the corporation and, thus, are not entitled to share in the profits, actual or future, yielded by the corporation's business, nor to assert rights based on the potential damage suffered because not receiving profits anticipated to be obtained from the notes or warrants held by them. They are to be assimilated to holders of debentures granting share conversion rights:

*« The view remains generally, that holders of debentures, with an option to convert, remain corporate creditors only, without any special status which affords them the opportunity to litigate in the area of potential damage to their economic interests »*[23]

110. Also under California law, shareholders and the corporation in which they own shares are separate legal entities. Thus, shareholders do not have a vested or ownership interest in the profits of a corporation: they *« ...own neither the property nor the earnings of the corporation... »*, they only own stock *« from which their [the shareholders'] income is derived upon the liquidation of assets or the declaration of dividens by the directors »*. If a corporation fails to make a level of profit in accordance with a shareholder's expectations, *absent proof of a duty personally owed to the shareholder*, the injury is to the corporation, and not to the shareholder[24]. Shareholders may only file derivative suits for the benefit of the corporation in which they own shares for claims based on injuries to the corporation since the cause of action is solely possessed by the corporation[25].

111. The California courts have also decided that a shareholder lacks standing to pursue directly damage compensation on the basis of a breach of fiduciary duties resulting in a decline in value of corporate stock. Such claims could be pursued by the shareholder only by way of a derivative, and not a direct, action[26]. Not surprisingly, the California courts have also decided that a holder of paper providing option or conversion rights to obtain corporate stock, for that reason deprived of

---

[22] Updated Request, at 36.

[23] *Kessler v. General Cable Corp.*, 92 Cal.App.3d 531, 540, 155 Cal. Rptr. 944, 100 (2nd Dist. 1979).

[24] *Nelson v. Anderson,* 72 Cal.App.4[th] 111, 126, 84 Cal. Rptr. 753, 763 (2nd Dist. 1999).

[25] *Jones v. H.F.Ahmanson,* 1 Cal.3d 93, 460 P.2d 464 (1969).

[26] *Schuster vs. Gardner*, 127 Cal.App.4[th] 305, 25 Cal. Rptr.3d 468 (4th Dist.2005).

standing to assert derivative claims, is not owed fiduciary duties by a corporation, its directors or controlling shareholders".

112. The Respondent has persuasively shown that the Definitive Agreement contains no Kyocera representation or warranty (and, indeed, no representation or warranty from anybody) guaranteeing LaPine a 6.6 percentage interest in LHC's share capital or any dividend or profit, or dividend or profit level originated in LHC's business, or relating to the future value of LHC or the warrants or LHC shares or LTC, and that no such representation or warranty is part of the indenture (the « Indenture ») dated 24 December 1986 between LHC and the trustee representing the note holders governing the issuance of notes and warrants convertible into LHC shares (to which, in any case, Kyocera is not a party)". Thus, under California law (see para. 110 above), the Claimant lacks standing to directly pursue his claims presently under consideration in absence of representations and warranties regarding share capital participation or profit levels specifically undertaken vis-à-vis the Claimant.

113. The same conclusion is to be reached in respect of the Claimant's standing when considering LaPine *qua* holder of convertible notes or, potentially, *qua* holder of warrants or LHC shares. It is clear under California law that notes or warrant holders are considered mere creditors of the corporation issuing the notes or warrants and thus lack standing to sue for loss of anticipated profit to be derived from the warrants or notes (see para. 109 above). At the end of the day, the access to the anticipated profits will depend on the note holders finally becoming LHC shareholders through the conversion of warrants into LHC shares. Further, in addition to the undisputed fact that LaPine had ceased to be a LTC shareholder and never became a LHC shareholder, under California law: (i) shareholders lack a direct action for any anticipated profits not obtained or diminution or destruction of the value of their shares; and (ii) may only file a derivative suit for the benefit of the corporation in which they hold shares to seek compensation to the corporation for the injury caused to it (see para. 110 above). Finally, no fiduciary duties are directly owed to shareholders for failure of the corporation in which they own shares for not obtaining expected or anticipated profits; such fiduciary duties may be only enforced vis-à-vis the corporation in question by way of a derivative suit. Notes or warrant holders are of course not owed such fiduciary duties either (see para. 111 above). Indeed, granting LaPine standing to pursue directly claims that really lie with LTC because it is the really damaged party and that can only be directly pursued by LTC or indirectly for its benefit by its shareholders by way of a derivative suit would risk imposing on Kyocera the obligation to pay twice for the same damages: under the Previous Arbitration initiated by LTC, and again under the present one initiated by LaPine, an outcome not to be countenanced by this Arbitral Tribunal.

114. The findings set forth above suffice to conclude on the absence of any triable genuinely material and disputed issue of fact regarding the Second, Fourth, Eighth and Ninth Claims for Relief and grant summary judgment as a matter of law against the Claimant on the merits of such Claims for Relief. The foregoing conclusions lead to the conclusion that the Claimant may not prevail on his Tenth Claim for Relief since the Arbitral Tribunal has found that: (a) the Claimant

---

" *Daly v. Yessne*, 131 Cal.App.4th 52, 63, 31 Cal. Rptr.3d 420, 428 (4th Dist. 2005).

" Respondent's Further Submission, at 17-18.

lacks standing to pursue claims against Kyocera in this arbitration based on the collapse, destruction or mismanagement of LTC or the failure for the LTC/LHC business to yield an anticipated level of corporate profit or shareholder dividend or LaPine not obtaining a certain percentage shareholding in LHC; and (b) there are no Kyocera representations and warranties in the Definitive Agreement, in the Indenture or in related documents guaranteeing LaPine a specific dividend or level of profits for LTC/LHC business or a specific shareholding in LHC or its value and all the claims contained in the Tenth Claim for Relief have been denied.

115. Further, the Arbitral Tribunal also concludes that the Respondent has presented a valid case for summarily dismissing Claimant's Second, Fourth, Eighth, Ninth and Tenth Claims for Relief on the merits on the basis of *estoppel* under California law.

116. In or about March 1988 LTC notified LaPine and other LTC shareholders of their rights to convert their initial warrants into warrants convertible into LHC shares. By then – as indicated by the Claimant: « *LaPine Technology was no longer actively in business, and the ongoing litigation between LaPine Technology and Kyocera over Kyocera's failure to execute the Amended Trading Agreement has destroyed LaPine Technology's ability to compete* »[*]

117. For those reasons, LaPine did not exercise his initial warrants conversion rights and received US$ 1.1 Million in exchange for his original notes and initial warrants, thus precluding the possibility of receiving LHC shares in exchange. Kyocera argues that by so doing without attempting to preserve its rights, LaPine is estopped from asserting claims relating to dividends or profits anticipated but not materialized, or compensation for injuries to him or to LTC/LHC as result of which such dividends or profits did not materialize, or from complaining that he was unable to obtain shares in LHC. Kyocera further points out that the Claimant, who never returned such moneys in escrow, has freely enjoyed their use during the last 18 years.

118. The Claimant, on the contrary, states that he received payment in order to meet his duty under California law to mitigate damages originated in Kyocera's breach of contract.

119. The Arbitral Tribunal points out first that there is no room for mitigation of damages absent a finding that the mitigating party prevails on at least a part of its claim for damages against the party entitled to mitigation. Since the Arbitral Tribunal has summarily dismissed on the merits Claimant's claims for breach of contract and fraudulent misrepresentation, the Claimant's argument that he accepted a sum of money to mitigate damages suffered from Kyocera's breach or wrongful conduct has become irrelevant and cannot stand.

120. In any event, the Claimant relies on *Vittal v. Long Beach Unified Sch. Dis.t*, 8 Cal. App.3d 112 (1970) to argue that by meeting his duty to mitigate by the only way then available – exchanging his notes for cash – the Claimant did not waive, and may not be estopped from asserting, its claims.

121. *Vittal* concerned a teacher employed on an hourly basis for several years to teach English at a junior college. In many opportunities she requested, and was denied, permanent status. In view

---

[*] Updated Request, para. 28, p. 14.

of such situation, she had recourse to the teacher's association to assist her. Shortly afterwards, she was notified that her teaching hours for school year 1967 had been reduced. She complained for such reduction, prompting her to go to court, that she considered to be a retaliation for her having taken her case to the teacher's association. The Court decided that she was entitled to permanent status but not to backpay pursuant to such status corresponding to the years prior to school year 1967, since she had accepted to serve during such period on an hourly basis or such claims were time-barred. Against the college's argument that the compensation fixed by the lower court for the school year beginning in September 1967 constituted « *...an unwarranted reformation or repudiation of the contract between the parties* » the Court held:

> «*Petitioner never agreed to the reduction in her teaching assignment but consistently protested against it and filed her petition for a judicial determination of her rights in December of 1967. Her conduct in performing her teaching duties in conformity with the reduced schedule was reasonably construed by the tribunal as a fulfillment of her duty to mitigate damages rather than an indication of her intention to waive her rights in the premises »*[iii]

122. Unlike LaPine, the petitioner in *Vittal* clearly preserved her rights by expressly protesting against conduct infringing such rights and promptly resorting to litigation to protect them. Such protestations allowed the *Vittal* Court to construe the teacher's performance not as a waiver of her rights, but as fulfillment of her duty to mitigate damages. Since LaPine received payment in exchange for his notes and any actual or potential rights arising from them without protestation or reservation or preservation of such rights, the Arbitral Tribunal concludes as a matter of law that by accepting such payment, rather than mitigating damages, LaPine waived such rights and is estopped from asserting claims based on them in this arbitration or elsewhere.

123. The conclusions reached above make it unnecessary for the Arbitral Tribunal to rule on the existence, validity and effects of the LaPine Waiver.

V. Respondent's Counterclaims

124. In the Terms of Reference (page 17) Kyocera states that « *except to the extent entitled to costs and attorney fees, Kyocera asserts counterclaims only in the event that the Arbitral Tribunal concludes that the Claimant may proceed on the merits of his claims* ». The Arbitral Tribunal has found that the Claimant's claims are to be summarily dismissed on the merits and, therefore, further finds that the Respondent's counterclaims are to be dismissed on the merits as well.

VI. Costs

125. The ICC Court has determined arbitral fees and reimbursable expenses and the ICC's administrative fees for this arbitration amount to US$ 410,000.00. In view of the legal complexity of this case and the novel issues raised by it within the context of an international arbitration, that justified the opposing positions taken by the Parties in connection with such issues, the Arbitral Tribunal decides, on the basis of authority vested in it under Article 20 of the

---

[iii] 8 Cal.App.3d at 123.

ICC Rules, that such fees and expenses shall be equally shared by the Parties, and that each Party shall bear, as the case may be, his or its own legal assistance and representation costs and fees.

VII. Decision

126. On the basis of the foregoing findings and conclusions the Arbitral Tribunal DECIDES:

(i)     to dismiss the Claimant's claims on the merits with prejudice;

(ii)    to dismiss the Respondent's counterclaims on the merits with prejudice;

(iii)   that: (a) the arbitral fees and reimbursable expenses and the ICC's administrative fees for this arbitration, amounting to US$ 410,000.00 shall be equally shared by the Parties; and (b) each Party shall bear his or its own legal representation and assistance costs and fees (Article 20 of the ICC Rules); and

(iv)    to dismiss any other claims filed by any Party in this arbitration.

Place of the Arbitration: San Francisco, California, U.S.A.

Signed this _29th_ day of _August_ 2007, in seven (7) original copies, all equally valid and authentic.

Gerald Aksen Esq.
Arbitrator

Graydon S. Staring Esq.
Arbitrator

Dr. Horacio A. Grigera Naón
Chairman

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS,

Jason A. FRY        18·02·08
Secretary General
ICC International Court of Arbitration

11/24/2004 6:05 PM (2K)

31