**EXHIBIT A**

**INTERNATIONAL CHAMBER OF COMMERCE**

**INTERNATIONAL COURT OF ARBITRATION**

In the Matter of an Arbitration

Between :

Anthony N. LaPine

(hereinafter, « Claimant » or « LaPine »)

And

Kyocera Corporation

(hereinafter « Respondent » or « Kyocera »)

> Further, both Claimant and Respondent shall be hereinafter collectively referred to as « Parties ».

ICC Arbitration  No. 7099/BGD/OLG/ESR/MS/JB

**Terms of Reference**

WHEREAS

- on 14 December  1990 the Claimant filed a request for arbitration (the « Request ») with  the Secretariat (the « Court Secretariat ») of the International Court of Arbitration of the ICC (the « ICC Court »);

- this arbitration has been commenced and takes place pursuant to Section 8.10 of a certain « Definitive Agreement and Plan of Reorganization » (the « Definitive Agreement ») dated as of 10 November 1986 in and between Lapine Technology Corporation (« LTC »), Prudential Bache Trade Corporation (« Prudential »), K.K. P B Trade Corporation (« KK P.B. »); LaPine Holding Company (« LHC »), LTC Merger Corporation, Kyocera, PRU TECH Research and Development Partnership (« PRU TECH ») and LaPine (Prudential, KK P.B. and PRU TECH hereinafter collectively referred to as « Prudential Respondents »), which recites as follows: « (a) <u>Subject Matter.</u> All questions, disputes or differences in any way arising out of or relating to this Agreement, any agreement contemplated hereby to the extent such agreement references this Section 8.10 or the Agreement in Principle or the transactions contemplated herein or therein, including, without limitation, as to the existence, interpretation, validity, application or breach of this Agreement, such referencing agreement contemplated by this Agreement or the Agreement

in Principle, or any tort, statutory or other claims arising between or among the parties, shall be settled by arbitration.(b) <u>Rules</u>. The arbitration shall be held in the City and County of San Francisco, State of California. (d) <u>Manner</u>. A party desiring to submit a matter to arbitration shall give written notice to the other parties hereto. The arbitral tribunal shall consist of three arbitrators, who shall be United States citizens or residents. The three arbitrators shall be appointed by the Court of Arbitration of the ICC. The arbitrators shall decide the matters submitted based upon the evidence presented, the terms of this Agreement, the Agreement in Principle and the laws of the State of California. The arbitrators shall issue a written award which shall state the bases of the award and include detailed findings of fact and conclusions of law. The United States District Court for the Northern District of California may enter judgment upon any award either by confirming the award or by vacating, modifying or correcting the award. The Court shall vacate, modify or correct any award: (i) based upon any of the grounds referred to in the Federal Arbitration Act, (ii) where the arbitrators findings of fact are not supported by substantial evidence; or (iii) where the arbitrator's conclusions of law are erroneous. (e) <u>Enforcement.</u> Judgment upon awards or orders of enforcement may also be entered by courts to which an award is presented in any other country. Execution upon awards or judgments upon awards may be had in accordance with the law of execution generally applied in each country where enforcement is sought » ;

- on page 1 of the Request it is stated that the arbitration was filed « ...for statute of limitation purposes .....» and it is further requested « ...that the proceedings not be commenced until there has been a preliminary award or awards in the previous matter »;

- the « previous matter » referred to in the Request is ICC arbitration case No. 6070 pending when the Request was filed (the « Previous Arbitration »);

- on 25 March 1991 Kyocera filed an answer to the Request (the « Kyocera Answer »);

- on 24 June 1991 the Prudential Respondents filed a joint answer to the Request (the « Prudential Answer »), together with the Prudential Securities Group Inc.;

- on 21 February 1992 the Court Secretariat wrote to the Parties to inform them that the ICC Court had decided, among other things, that the arbitration could not proceed against the Prudential Securities Group Inc., and to confirm San Francisco, California, U.S.A. as place of arbitration;

- on 3 April 1992, the Court Secretariat wrote to inform that the ICC Court, at its session of 1 April 1992, appointed Neil F. Phillips Esq. as Chairman of the Arbitral Tribunal and Graydon S. Staring Esq. and Gerald Aksen Esq. as co-arbitrators;

- by Procedural Order No. 1 of 6 July 1992 the Arbitral Tribunal ruled « that the proceedings of any matter in this arbitration not be commenced until after there has been a final award in the previous arbitration »;

- on 25 August 1994 a final award on the merits was issued in the Previous Arbitration;

- further to discussions in a preliminary hearing held in San Francisco on 18 October 1994 and the unanimous agreement of the parties, by communication of the Arbitral Tribunal of 28

October 1994 all proceedings in the arbitration were stayed in view of proceedings taking place before the US Federal Courts in connection with awards issued in the Previous Arbitration;

- by letter of 20 February 1997 the Court Secretariat informed that it had learnt that the Chairman of the Arbitral Tribunal Neil Phillips Esq. had passed away;

- by letter of 12 March 1997 the Court Secretariat took note of the parties' agreement to postpone the re-constitution of the Arbitral Tribunal until the conclusion of litigation before the U.S. Court regarding the Previous Arbitration;

- by letter of 9 June 2002 the Court Secretariat took note of the Order of the US District Judge confirming the award in the Previous Arbitration as to Phase 1;

- by letter of counsel to the Prudential Respondents dated 5 February 2004 to the Court Secretariat, it was confirmed that all judicial or other action regarding awards rendered in the Previous Arbitration had become final;

- by letter of 12 February 2004 the Court Secretariat invited the Claimant to comment on the constitution of the Arbitral Tribunal on or before 2 March 2004 ;

- by letters both dated 30 July 2004, counsel to Kyocera and to the Prudential Respondents suggested that these arbitral proceedings be closed;

- by letter of 18 August 2004 the Claimant stated that it was not withdrawing the Request and expressed its intention to continue the present arbitral proceedings;

-by letters all dated 16 August 2005 the Claimant, the Prudential Respondents and Kyocera set forth their respective views regarding the further course of the arbitral proceedings;

- by letter of 9 February 2006 the Court Secretariat informed the Parties that on 8 February 2006 the ICC Court had appointed Dr. Horacio A. Grigera Naón as Chairman of the Arbitral Tribunal;

- by letter of 20 April 2006 the Court Secretariat communicated that the file was being transmitted to the new Chairman of the Arbitral Tribunal;

- by communication of 5 May 2006 the re-constituted Arbitral Tribunal directed the Claimant to file an updated arbitration request ( the « Updated Request ») and Kyocera and the Prudential Respondents updated answers according to a calendar set forth in such communication;

- in response to a request from the Claimant, not objected by the other parties, by communication of 25 May 2006 the Arbitral Tribunal extended the timeline to file the Updated Request until 2 June 2006 and the timeline to file answers thereto until 30 June 2006;

- on 2 June 2006 the Arbitral Tribunal received an Updated Request and annexes in electronic format; on 30 June 2006 the Arbitral Tribunal received Kyocera's updated answer and counterclaim, that includes a Motion for Summary Adjudication and annexes in electronic format, followed by hard copies received by courier (the « Kyocera Updated Answer and Counterclaim »). No updated answer was received from the Prudential Respondents ; and

-- the arbitration was initially set in motion by the ICC Court between LaPine on one hand and the Prudential Respondents and Kyocera on the other. However, by e-mail communication of 17 July 2006 sent by the Claimant in response to a question of the Arbitral Tribunal and copied to counsel for the Prudential Respondents and for Kyocera, the Claimant confirmed that all « ...of Claimant's claims against the Prudential Respondents have been withdrawn ». No objection to such withdrawal has been signified to the Arbitral Tribunal by the Prudential Respondents or by Kyocera.

NOW THEREFORE, by signing these Terms of Reference, the Parties agree to the following Terms of Reference according to Article 13 of the ICC Rules of Conciliation and Arbitration (in force as of 1 January 1988), hereinafter the « ICC Rules »:

1. Full names and Description of the Parties

1.1. The Claimant is Anthony N. LaPine, an individual who resides in Los Gatos, California, U.S.A. The Claimant's address is as follows:

SEMOTUS
16400 Lark Avenue, Suite 230
Los Gatos, California 95032 U.S.A.
Telephone : 408 358 7011/7100
Facsimile : 408 904 7699 ;
E-mail : tlapine@semotus.com

1.2. The Respondent is

Kyocera Corporation, a corporation organized and existing under the laws of Japan, with its principal place of business in Kyoto, Japan. Kyocera's address is as follows:

6 Takeda Tobadono-Cho, Fushimi-Ku
Kyoto, 612-8501 Japan.

2. Names of Counsel for the Parties and Addresses at which Notifications and Communications arising in the course of the Arbitration may be made

Counsel for the Claimant

Edward M. Gergosian Esq., Robert J. Gralewski Jr. Esq and Brooke E. West Esq.
Gergosian & Gralewski L.L.P.
550 West C Street Suite 1600
San Diego California 92101 U.S.A.
Telephone : 619 230 0104
Facsimile : 619 230 0124
E-mail : ed@gergosian.com

Counsel for the Respondent

Eugene D. Gulland Esq. and Donald J. Ridings, Jr. Esq.
Covington & Burling
1201 Pennsylvania Avenue N.W.
Washington D.C. 20004 U.S.A.
Telephone: 202 662 5504
Facsimile: 202 778 5504
E-mail: egulland@cov.com
         dridings@cov.com

3. Summary of the General Factual Background [1]

(i) LaPine founded LTC in 1980 to design, manufacture and market 3.5. Winchester Disk Drives for use in desk-top computers, microcomputers and other applications that contained specific proprietary characteristics not found in Winchester disks then in the market.

(ii) From its formation until around December 1986 LaPine owned 29 % of LTC's common stock. LaPine was also Chairman of LTC's Board of Directors and President and Chief Executive Officer of LTC from its inception through October 1986.

(iii) In late 1984 and early 1985 LTC, Kyocera and Prudential formed a business relationship to manufacture and finance LTC's disk drives and to market them around the world, as follows: a) LTC granted Kyocera the right to manufacture disk drives, assumed the obligation to market the drives, and promised to buy a minimum number of drives from Kyocera each year; b) Kyocera agreed to invest in LTC, build facilities to manufacture disk drives and sell the disk drives to LTC at the lowest possible price; and c) Prudential promised to provide necessary working capital to develop and manufacture LTC's disks, including accounts receivable financing and, to ensure prompt and timely payment to Kyocera for the drives it manufactured, to purchase disk-drive units from Kyocera and resell them to LTC.

(iv) As a result of differences that arose among LTC, Kyocera and Prudential in 1985 and early 1986, a number of agreements were reached as a result of ensuing negotiations aimed at a reorganization of their relationship (the « Reorganization »). On 9 October 1986 LTC, the Claimant, Prudential and Kyocera executed together with other parties an Agreement-in – Principle (the « Agreement-in-Principle ») that, among other things, provided that LTC would be restructured, that the manufacturing, technology and trading agreements previously governing the relationship between the parties  would be altered and that the parties would attempt in good faith to negotiate the terms of the proposed Definitive Agreement.

(v) The terms and conditions of the Reorganization were embodied in the Definitive Agreement that, among other things, provided as follows: a) LTC's existing shareholders, including LaPine would transfer LTC stock to LHC, a holding company owned by Prudential (66-2/3 %) and Kyocera (33-1/3%); b) LTC's shareholders, including LaPine, each received a cash payment

---

[1] Description of legal instruments and other documents herein are for purposes of general background information and are not to be regarded as establishing the interpretation or the legal effect of any document.

amounting in the aggregate, for all of them, to US$ 2.5 million, guaranteed subordinated notes issued by LHC amounting to US$ 4 million due on 31 March 1988 (the « Original Notes ») and initial warrants giving the right to acquire final warrants under which their holders could surrender their Original Notes and acquire up to US$ 15 million of subordinated notes issued by LHC and convertible into 22.5% of outstanding common stock of LHC made available for subscription within the context of a future public offering of LHC shares; and c) LTC employees who owned stock options in LTC, including LaPine, also received an interest in an escrow account.

(vi) Section 8.9 (a) of the Definitive Agreement, entitled « Company and LaPine Release », released Kyocera and the Prudential Respondents of all claims from LaPine (the «Pincipal Shareholder ») or LTC (the « Company ») against Kyocera or the Prudential Respondents « ...for or by reason of any matter in any way arising from or related to the relationship between... » the Prudential Respondents and Kyocera (or any of them), on the one hand, and LaPine or LTC, on the other. However, pursuant to Section 8.9 (b) of the Definitive Agreement such release (hereinafter, the « Release ») remains in effect as to each of the Prudential Respondents and Kyocera, respectively, « ....only so long as such party is not in material breach of its binding obligations.... » under the Definitive Agreement.

(vii) The subsidiary agreements attached to the Definitive Agreement included an Amended Trading Agreement (« ATA ») that LTC, Kyocera and Prudential were to execute on or before 29 December 1986 and that set forth the terms and conditions under which Kyocera would sell disk drives to the reorganized LTC. Disputes arose between Kyocera and Prudential in connection with the ATA that, according to Kyocera, had been surreptitiously rewritten by Prudential to have it sell disk drives directly to LTC and receive payments from it, rather than sell the drives directly to Prudential, as in the past. Prudential stuck to the terms and conditions of the rewritten ATA which, according to Prudential, was accepted by Kyocera by signing the Definitive Agreement. Kyocera disagreed.

(viii) Despite differences between Prudential and Kyocera regarding the substance of the ATA, LTC restructuring went forward and was closed on 24 December 1986. On that date, LaPine executed the closing documents. On 29 December 1986 Kyocera, Prudential and LTC entered into an Interim Agreement attempting to negotiate their differences(the « Interim Agreement »). On the same date, the same parties executed an Addendum to Financing Agreement (the « Financing Addendum ») providing that the obligation of Prudential to finance the business of LTC would terminate if Kyocera did not execute the ATA by 31 March 1987.

(ix) However, the relationship between Kyocera and Prudential continued to deteriorate.In October 1987, the Previous Arbitration, involving, *inter alia*, Prudential and Kyocera (but not LaPine), was commenced.

(x) In March 1988 LaPine was notified of the right to convert his initial warrants. LaPine chose instead to cash the Original Notes.

(xi) The Tribunal hearing the Previous Arbitration issued two awards (Phase 1 and Phase 2 Awards). In the Phase 1 Award, rendered on 28 December 1990, the Tribunal ruled that Kyocera

breached its obligations by failing to execute the ATA. In the Phase 2 Award, rendered on 25 August 1994, the Tribunal awarded damages to LTC « leaving it to LTC to allocate the funds to its shareholders ».

(xii) After litigation regarding the enforceability of the Phase 1 and 2 Awards in United States Courts, Kyocera and Prudential settled their dispute in December 2003.

4. <u>Summary of the Parties' Respective Positions, Claims, Defenses and Relief Sought.</u>

The following summaries are intended to satisfy the requirements of Article 13 (1) of the ICC Rules without prejudice to other or further allegations, arguments or contentions contained in the submissions or pleadings filed to-date and in such further submissions as may be made in these proceedings in accordance with the ICC Rules. By signing these Terms of Reference the Parties do not subscribe to, or acquiesce in, the summary of the other Party set forth below.

4.1. <u>Summary of the Claimant's Position</u>

    A.    <u>Claims</u>

    (i)    In his Updated Request, the Claimant names only Kyocera as Respondent and does not address claims against the Prudential Respondents.

    (ii)    The Claimant claims that in 1986 the Claimant owned 29% of LTC, a company he founded to develop hard disk drives for the nascent personal computer industry. When Kyocera and Prudential acquired LTC in late 1986, the Claimant exchanged his 29% interest in LaPine Technology for consideration that included the right to acquire 6.6% of LHC (formed to hold LTC once it was acquired). By the time the Claimant was entitled to exercise that right, however, LTC had been destroyed by the actions of defendant Kyocera. As the tribunal in the Previous Arbitration concluded, Kyocera breached the contract it had entered into with Prudential and the Claimant, and said breaches caused the demise of LTC, rendering worthless the right to acquire 6.6% of LHC, which right the Claimant received for giving up his 29% interest in LTC.

    (iii)    The Claimant contends that the Previous Arbitration involved or concerned the same facts, events, issues, and transactions alleged in this matter; and that the tribunal's findings of fact and conclusions of law in the Previous Arbitration should apply with equal force in this case.

    (iv)    The Claimant also contends that, within the context of the Reorganization, Kyocera and Prudential represented to the Claimant that, as collective owners of all of LTC stock, they could assure proper management of LTC through a successful public offering.

    (v)    The Claimant further states that in order to consummate the Reorganization, a special meeting of former LTC shareholders took place on 15 December 1986, in the course of which the shareholders were provided with a proxy statement that, among other

things, represented that the Reorganization would restructure the existing agreements between LTC, Prudential and Kyocera, including those relating to the manufacture and sale of LTC's products and inventory accounts financing, and conditioned the Reorganization on the resolution of certain disputes then existing among the parties regarding ownership and use of technology and financing and a release of all claims of liability arising from any alleged breaches of the prior agreements between the parties concerning such matters. The Claimant says that in reliance on such representations he executed the Definitive Agreement and all subsidiary documents referred to therein.

(vi)   According to the Claimant, on or about 22 December 1986 counsel to Kyocera informed counsel to LTC and counsel to Prudential that Kyocera did not intend to execute the ATA in the form appended to the Definitive Agreement and intended to negotiate a substantially different ATA with Prudential that: (a) would alter the pricing method of products to be marketed by LTC; and (b) substitute LTC for Prudential as the purchaser of the products manufatured by Kyocera. The Claimant indicates that the existence of the Interim Agreement and the Financing Addendum was unknown to the Claimant when he signed the Definitive Agreement, and that had he been aware of their existence, he would not have allowed the Reorganization to close.

(vii)  The Claimant alleges that during the negotiations between Prudential and Kyocera relating to the text of the ATA, Kyocera refused to deliver disc drive units to LTC in the required quantities and agreed on prices and insisted on receiving payments in excess of the contractual prices. The Claimant further alleges that, because of such actions, Kyocera substantially contributed to the destruction of the 6.6 % interest in LHC that the Claimant contends he was entitled to acquire under the Definitive Agreement. The Claimant also alleges that after the Definitive Agreement was signed and the terms of the Amended Trading Agreement were set specifying that Kyocera would provide drives at 78 % of the market price in U.S. Dollars, the exchange rate between the Japanese Yen and the United States Dollar changed significantly. The Claimant contends that because the ATA fixed the price chargeable by Kyocera to LaPine in Dollars, the terms of the ATA became less favorable to Kyocera. The Claimant alleges this factor as a reason that Kyocera refused to honor the terms of the ATA.

(viii) The Claimant states that in early June 1987 LTC notified Kyocera that because of Kyocera defaults under the Definitive Agreement, LTC was terminating the interim technology and trading agreement then in place. Thus – the Claimant contends – when on or about March 1988 LTC gave notice to LaPine and the other former LTC shareholders of their right to convert the initial warrants into final warrants, LTC was no longer actively in business and the ongoing litigation between LTC and Kyocera over Kyocera's failure to execute the ATA in the form required by the Definitive Agreement had destroyed LTC's ability to compete.

(ix)    The Claimant further contends that he resigned his shareholdings in LTC, his position as LTC Chairman of the Board, his employment relationship and his ability to assure a successful future for LTC against representations made to him within the context of the Reorganization and, especially, the receipt of the initial warrants and the attached right to recapture a significant part of his ownership of the business within the context of a public offering of LHC shares (anticipated to take place, according to the Claimant, as early as March 1988) that would secure  about 6.6 % of LHC stock for the Claimant. The Claimant states that had he not obtained such warrants, he would not have entered into the Definitive Agreement.

B.    Relief Sought

(a) First Claim for Relief

As a result of Kyocera's wrongful failure to honor its contractual commitment to execute the ATA in the form required in the Definitive Agreement, the Claimant has been substantially injured  in that Kyocera's conduct was a substantial contributing factor in the destruction of LTC which, in turn, has rendered worthless the 6.6 % interest in LHC which the Claimant was entitled to acquire. The Claimant is entitled to compensation for the direct and proximate damages resulting from such material breach of the Definitive Agreement.

(b) Second Claim for Relief

Implicit in the Definitive Agreement and related agreements was an implied covenant material to the transaction that Kyocera and Prudential would conduct the business of LTC in business like fashion. Kyocera breached such covenant by prematurely causing the collapse of LTC. Claimant is entitled to damages suffered as a direct and proximate result of such breach of the Definitive Agreement.

(c) Third Claim for Relief

Kyocera breached an implicit covenant of Good Faith and Fair Dealing under California law by concealing Kyocera's true intent as to the Agreement-in-Principle, the Definitive Agreement and the ATA through  a scheme, artifice and conspiracy to defraud and deceive for the purpose of inducing the Claimant to execute such agreements, that included, without limitation (and as further detailed in the Updated Request) false and misleading statements, representations and omissions as to Kyocera's non-intention to execute the ATA as required by the Definitive Agreement. The Claimant is entitled to damages suffered as a direct and proximate consequence of such wrongful conduct by Kyocera.

(d) Fourth Claim for Relief

On or after 29 December 1990 Kyocera breached the Definitive Agreement and related Agreements by not supplying disk drives to LTC at 78 % of the market price. Although as a consequence of such breaches Kyocera's right to manufacture and sell disk drives based on LTC technology was extinguished, Kyocera continued to manufacture and sell such disk

drives. The Claimant is entitled to damages suffered as a direct and proximate consequence of such wrongful conduct by Kyocera.

(e) Fifth Claim for Relief

Kyocera concealed its true intent to capitalize on the weak financial condition of LTC and the frustration of Prudential in its relationship with Kyocera in order to drive LTC out of business so that Kyocera would obtain greater rights to LaPine disk drive technology and not to resolve all disputes, including those concerning Kyocera or relating to the ATA, as represented in the Agreement-in-Principle, the Definitive Agreement and the proxy statement. Had the Claimant known Kyocera's true intent, he would not have entered into the Agreement-in-Principle or the Definitive Agreement, and is thus entitled to damages as a direct and proximate result of the breach of these obligations.

(f) Sixth Claim for Relief

For the purpose of inducing the Claimant to execute the Definitive Agreement, Kyocera actively made and perpetrated materially false or misleading statements and omissions in connection with such Agreement, and Kyocera was thus negligent with regard to the truthfulness of its representations to the Claimant, who relied on said statements and who, had he known the falsity of such statements, would not have entered into the Definitive Agreement. The Claimant has suffered damages as a direct and proximate result of the breach of this obligation for which he is entitled to compensation.

(g) Seventh Claim for Relief

Kyocera made and perpetrated false and misleading statements, representations and omissions on Kyocera's and Prudential ability to take LHC to a successful public offering as contemplated at the time of the closing of the Reorganization. Claimant relied on such statements, and had he known about their falsity, he would not have entered into the Definitive Agreement. As a direct and proximate result of the breach of this obligation, Claimant has suffered damages for which he is entitled to compensation.

(h) Eighth Claim for Relief

By acting negligently in the management of LTC and not resolving disputes with Prudential in a way that would not destroy LTC, Kyocera destroyed LTC and the value of the 6.6% interest in LHC that the Claimant was entitled to acquire and violated the duty under the Definitive Agreement as to the Claimant to act with care in the management of LTC at least until there was a successful public offering of LHC shares. As a direct and proximate result of the breach of this obligation Claimant has suffered damages for which he is entitled to compensation.

(i) <u>Ninth Claim for Relief</u>

As a result of the Definitive Agreement, the control of LTC was transferrred to Kyocera and Prudential, so that the survival of LTC was directly dependent on Kyocera and Prudential. For that reason and other relationships with LTC, Kyocera owed fiduciary duties to act in the highest good faith towards LTC and the Claimant precluding Kyocera from obtaining benefit to the detriment of LTC and the Claimant. Such fiduciary duties were breached by the failure of Kyocera to honor its commitments under the Definitive Agreement and allowing the closing of the Reorganization to occur under circumstances likely to cause further dispute leading to the demise of LTC. As a direct and proximate consequence of such wrongful conduct, the Claimant suffered damages for which he is entitled to compensation.

(j) <u>Tenth Claim for Relief</u>

Kyocera further breached an implicit covenant of good faith and fair dealing under California law by: (1) Causing the collapse of LTC for its own benefit to the detriment of the Claimant; (2) Doing nothing to preserve any value for the warrants of the Claimant; (3) Mismanaging LTC; (3) allowing the closing of the Reorganization and related agreements under circumstances that would lead to the demise of LTC; (4) failing to advise the Claimant before he signed the various agreements relating to the Reorganization that it would not sign the ATA; (4) misappropriating the LaPine disk drive techonology for its own use; and (5) failing to mitigate damages in its dispute with Prudential by supplying (and not discontinuing the supply of) disk drives to LTC at 78% of the market price and seeking damages for the difference between such price and the figure it believed justified or in the original ATA. According to the Claimant, such conduct would have saved LTC. As a direct and proximate result of Kyocera's breach of such covenant, Claimant has suffered damages for which he is entitled to compensation.

C.        <u>Quantification, Scope and Method for the Calculation of Damages</u>

 The Claimant contends that he has suffered a loss of over US$ 30,000,000.00, which he seeks to recover in this arbitration and that, at a minimum, the Claimant has been damaged in a sum to be determined according to proof as based on the current value of a 6.6% interest in LTC compared to the history of Conner Peripherals or other companies of the same field. Further, in connection with his claims for fraud, deceit and concealment, the Claimant claims the assessment of punitive damages against Kyocera at least three times actual damages.

D.        <u>Answer to Kyocera's Motion for Summary Adjudication</u>

  *(i)*     More than 90% of the delay between filing and commencement occurred because of the pendency of the Previous Arbitration and the concurrent views of all the parties and the Arbitral Tribunal that the commencement of this matter should await a final award in the Previous Arbitration. Kyocera chose, as is its right, to challenge and appeal that award all the way to the United

States Supreme Court. Claimant, however, should not be denied his day in court because all parties and the Tribunal chose the path of efficiency.

(ii)    While it is the policy in California that a plaintiff proceed with reasonable diligence in the prosecution of an action, it is also the policy that all parties must cooperate in bringing the action to disposition (California Code of Civil Procedure §583.130). The parties have cooperated in bringing this matter to disposition by *unanimously* agreeing about the timing of the commencement of this arbitration. Furthermore, the policies favoring: (i) the rights of the parties to make stipulations in their own interest ; and (ii) disposition of an action on the merits are generally to be preferred over the policy requiring dismissal for failure to proceed with reasonable diligence( *Id.*California Code of Civil Procedure).

(iii)    California Rule of Court 373 (e) requires that when ruling on a motion to dismiss for delay, a court *must* consider "the pendency of other litigation under a common set of facts or determinative of the legal or factual issues in the case." *Id.* This arbitration was stayed for 14 years precisely because of the pendency of another arbitration involving a common set of facts and determinative of both the legal and factual issues in this case.

(iv)    In light of all the facts and circumstances, the Claimant has proceeded with reasonable diligence. Between December 1990, when the Claimant filed his claim, until February 2004, the Claimant did all he could to prosecute his claim. This arbitration was stayed until February 2004 (while Kyocera unsuccessfully defended and appealed the related prior arbitration), and said stay was ordered by the Arbitral Tribunal with the *unanimous* consent of all the parties including Kyocera. From that point, Claimant attempted to locate his counsel of record, who had been disbarred for, *inter alia*, failing to communicate with his clients, and thereafter retained new counsel, who appeared in this matter on Claimant's behalf in July 2005. Under the rules governing dismissals for delay, and the policy articulated in California's Code of Civil Procedure, Kyocera's motion to dismiss for failure to prosecute must be denied.

(v)    Kyocera's standing argument depends wholly on its characterization of the Claimant as a warrant holder, and ignores his capacity as a signatory and party to a contract that Kyocera breached. As such, the Claimant can sue Kyocera for the harm caused to him by Kyocera's breach – the Claimant's status as a warrant holder is irrelevant to that standing. Here the Claimant relied on Kyocera to his detriment by giving up his 29% interest in LTC in return for the opportunity to acquire a 6.6% interest in LHC. Kyocera's breach destroyed that opportunity and eliminated the consideration for which Claimant had bargained. That the opportunity was contingent does not alter Kyocera's culpability or its obligation to pay damages that resulted from its breach. Furthermore none of Kyocera's authority supports its suggestion that

Claimant lacks standing as a party to the Definitive Agreement to bring a claim for damages caused by a breach of that Agreement.

(vi)     The Claimant did not release and has never released any claim against Kyocera for Kyocera's breach of the Definitive Agreement. As Kyocera acknowledges, the Definitive Agreement, at ¶8.9(b) specifically reserves from ¶8.9(a)'s release any claim for a material breach of the Definitive Agreement. The tribunal in the Previous Arbitration found that Kyocera breached the Definitive Agreement, and that the breach was material. In order to avoid the impact of those findings, Kyocera weakly argues that another writing, never mentioned in the Definitive Agreement, constitutes a waiver of the protections of ¶8.9(b). The Claimant asserts he never waived the protections of ¶8.9(b), while Kyocera ignores the fatal flaw in its waiver argument – the "Entire Agreement" provision embodied in ¶8.5 of the Definitive Agreement limits the *entire agreement* between the parties to the terms in the Definitive Agreement and in those agreements, documents and instruments referred to in the Definitive Agreement. Kyocera does not – because it cannot – direct the Arbitral Tribunal to any reference to this so-called waiver in the Definitive Agreement. There is no such reference and thus the Claimant never waived his claims against Kyocera for breach of the Definitive Agreement.

(vii)    Similarly, the three-year statue of limitations for fraud and negligent misrepresentation does not bar the Claimant's fraud and negligence claims. As Kyocera notes, the running of that three-year statute is governed by the "discovery rule." The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. Here the Claimant was not aware of his injury until March 1988 when he was required to make his election to acquire warrants for his original notes and he was told at the time the warrants would be worthless as a result of Kyocera's actions. Thus his December 1990 filing was timely and his fraud and negligence claims are not time-barred.

(viii)   When the Claimant made his decision in 1988 to exchange his original notes for cash, he was under a duty, as are all breach of contract victims in California. to mitigate the damages he suffered as a result of Kyocera's wrongful conduct. As he had been told at the time of the election that the final warrants would be worthless, he mitigated his damages by electing the only true vehicle available to him at the time – exchanging his original notes for cash. To suggest that by mitigating his damages, the Claimant waived his claims is unsupported by the facts and the law.

E.    <u>Reply to Kyocera's Counterclaim</u>

(i)    **First Counterclaim:** Kyocera does not plead this fraud-based claim with the requisite particularity, failing to identify the particular defects at issue, when the defects appeared, what if anything that was said about the disc drive design,when it was said, by whom and to whom. This counterclaim for undisclosed design defect was released by Kyocera by virtue of the Release executed in the Claimant's favor on or about 29 December 1986. Moreover, in the Definitive Agreement, the purchase price payable and tendered by Kyocera included cancellation of all claims for losses in aggregate of US$ 3.2 million ostensibly incurred by Kyocera in the manufacture of company products. To the extent these claims relate to a post-Definitive Agreement claim about the printed circuit board: (a) Kyocera has signed off on and approved the disc drive design prior to the closing of the Definitive Agreement; (b) Kyocera released all pre-Definitive Agreement claims, including those based on later-discovered facts; and (iii) following the Definitive Agreement, the Claimant was no longer involved with the company. Moreover, the arbitral tribunal in the Previous Arbitration rejected Kyocera's defect claims as a defense to its breach. Finally, this counterclaim is barred by the statute of limitations as Kyocera failed to bring this counterclaim in its March 1991 answer to the Claimant's request for arbitration or at anytime thereafter until June 2006.

(ii)    **Second Counterclaim:** The Claimant did not waive his claims against Kyocera when he signed the Definitive Agreement, which specifically reserved Claimant's claims for breaches of such Agreement. The Claimant disputes that he received any notice prior to the closing that Kyocera would not honor its obligations under the Definitive Agreement, and in any event the Claimant never waived the requirement that Kyocera honor those obligations. The Definitive Agreement provides at § 8.5 therein that such Agreement « ....(including, without limitation, the agreements, documents adn instruments *referred to herein* (a) constitute the *entire agreement* and supersedes all prior agreements and understandings, both written and oral among the parties to the subject matter hereof..... »(emphasis added). Moreover the arbitral tribunal in the Previous Arbitration found that Kyocera had breached the Definitive Agreement. Finally, Kyocera is not entitled to recover fees or costs against the Claimant.

(iii)    **Third Counterclaim:** By his Updated Request, the Claimant seeks to recover for the damages caused to him by Kyocera's breach of contract, fraud and negligent misrepresentations. The Claimant does not seek a double recovery of anything, and to the extent any amount awarded to him in this proceedings represents a double recovery, the Claimant agrees that such an award may be reduced to eliminate the prospect of a double recovery.

4.2. Summary of the Respondents' Position

I.    Kyocera

A.    Facts and Argument

  (i)  Kyocera argues that by choosing to wait 15 years to activate this arbitration, LaPine forfeited his right to pursue his claims. California has a strong public policy, embodied in statute, that requires claimants to be diligent in pursuing claims. California courts have held this policy applies with equal if not greater force to arbitration, which is intended to provide an efficient non-judicial forum for resolving disputes expeditiously.

  (ii)  Kyocera further argues that LaPine was paid all the money owed to him totaling US$ 2 million and that, because of the Release in the Definitive Agreement, the Claimant may not advance any further claims, in contract or tort, against Kyocera arising out of any relationship between the Claimant and Kyocera, like those the Claimant attempts to advance in this arbitration. In this regard, Kyocera also notes that on 24 December 1986, LaPine executed a broad and unconditional written waiver of the requirement that Kyocera execute or deliver the ATA. According to the literal text of such waiver, Kyocera contends that LaPine « waive[d] the requirements set forth in Sections 3.6 and 6 of the Definitive Agreement...that the Amended Technology Agreement and the [ATA] (or either of them) be executed and delivered by the parties thereto. »

  (iii)  Kyocera further contends that in March 1988 the Claimant was notified of his right to convert his initial warrants into final warrants (convertible into LHC shares) and that, at that point in time, the Claimant was aware that LTC had suspended operations and that the Previous Arbitration had been commenced. However – Kyocera alleges – the Claimant elected to receive US$ 1.1 million although he knew that he would have been required to forfeit guaranteed compensation of over US$ 1.1 million payable under the original notes in order to exercise his conversion rights. Thus, according to Kyocera, the Claimant irrevocably gave up the opportunity to acquire final warrants and convertible notes enabling him to acquire LHC shares in a public offering.

  (iv)  Kyocera's contention in this respect is that, by LaPine letting his inital warrants expire, he received such US$ 1.1 million amount in full payment of its original notes and, for that reason (and since he has not tendered back or escrowed the US$ 1.1 million he received in exchange for such notes and has used those monies for the past 18 years), that LaPine has waived all claims, or is estopped from asserting claims, regarding the right under its initial warrants to obtain LHC shares in a future public offering.

(v)    Kyocera states that the Claimant lacks standing to advance claims based on a theory that Kyocera mismanaged LTC resulting in the destruction of the value of LHC rendering the right under the Claimant's initial warrants to obtain shares in LHC following a public offering worthless. Kyocera points out that, under California law: (a) except for claims alleging breach of warrant documents (not being asserted in this arbitration), a warrant holder is a creditor of the issuer of the warrant who lacks standing to claim for the alleged destruction of a warrant holder's conversion rights, in the same way that, under California law, a stockholder's claims arising from the alleged diminution in value of a company's shares must be brought as a derivative action; and (b) that claims for mismanagement or other injury to a company may only be brought by the company itself or in a derivative suit brought on such company's behalf by a shareholder and that, not only is the Claimant not a shareholder in LTC or LHC, but even in such capacity, he would lack standing to assert such claim individually.

(vi)   Kyocera also states that the Claimant's fraud claims are barred under the statute of limitations under California law.

(vii)  In short, Kyocera argues that all Claims or Relief asserted by the Claimant must be dismissed under California law, policy or principles of waiver or estoppel either because : (a) the Claimant forfeited the right to pursue his claims by failing to prosecute them in a timely fashion ; or b) the Claimant's Updated Request fails to state a claim upon which relief can be granted because (i) the Claimant lacks standing to pursue such Claims, (ii) Claimant released such Claims in writing (and waived Kyocera's execution of the ATA), and/or (iii) all of Claimant's Claims are barred under principles of waiver and/or estoppel.

(viii) In addition, Kyocera alleges that the Claimant's fiduciary duty claims are barred by the Claimant's unconditional waiver of Kyocera's obligation to sign the ATA and because as a matter of law no fiduciary duty arises in favor of a nonn-shareholder who has a contingent right to acquire shares in the future. Kyocera further argues that the statute of limitations ran on LaPine's fraud and misrepresentation claims.

(ix)   Kyocera denies that it breached any legal obligations owed to the Claimant, denies that it caused any injury to the Claimant, and denies all allegations in the Claimant's Updated Request that are inconsistent with the positions set out in the Kyocera Updated Answer and Counterclaim. Kyocera sets off any liability to the Claimant against the amount of the Claimant's liability to Kyocera on any ground that may result from findings and determinations of the Arbitral Tribunal in these proceedings. Kyocera also disputes that the Claimant suffered any damages.

(x)    Kyocera also contends that some or all of the Claimant's claims are inconsistent with facts asserted or admissions contained in the Request, and that the Claimant is improperly asserting claims against Kyocera for breaches committed or injuries caused by the Prudential Respondents, whose liability has apparently been released or discharged. Kyocera contends that any liability it has to the Claimantis likewise discharged, and that the Claimant may not recover damages from Kyocera where it has received amounts in settlement·from Prudential.

(xi)    Kyocera also disputes LaPine's assertion that as a matter of law, the Tribunal must apply in this proceeding findings and conclusions from the Previous Arbitration.

(xii)    Kyocera finally requests that the Claimant's claims be denied in their entirey and that it be granted full compensation for costs (including attorney fees) incurred in this case and other and further relief that is just in the circumstances.

B.    Counterclaims

(i) Kyocera states that except to the extent entitled to costs and attorney fees, Kyocera asserts counterclaims only in the event that the Arbitral Tribunal concludes that the Claimant may proceed on the merits of his claims. Kyocera alleges that the Claimant was aware of the existence of critical design defects in the disk drives before they were discovered by Kyocera in order to induce Kyocera to agree to manufacture LTC's disk drives and invest in LTC.Despite such circumstance, Kyocera contends that the Claimant made representations concerning such drives that were false or incomplete and that the Claimant knew were false and incomplete, but were not disclosed by the Claimant to Kyocera despite his duty to do so. If the Claimant did not know about the critical defects in the drives, it acted with negligence and in all events in breach of the convenant of good faith and fair dealing that is implied in all contracts governed by California law. Kyocera alleges that on the strength of such representations of the Claimant Kyocera entered into agreements with the Claimant and third parties under which Kyocera undertook to manufacture disk drives for eventual sale through the Claimant's company LTC.

(ii) Further, the Claimant waived his claims in writing when he signed the Definitive Agreement. By bringing this arbitration notwithstanding such waivers, the Claimant has caused Kyocera to expend attorney's fees and other costs in the defense of this arbitration, that are recoverable by Kyocera as damages for LaPine's breach.

(iii) The Claimant has also breached the implied covenant of good faith and fair dealing under California law by bringing this case after receiving payments exceeding US$ 1.1 million in exchange for his original notes in order to obtain compensation for such original notes a second time.

C.    Relief Sought in Connection with the Counterclaims

Should this case proceed on the merits despite Kyocera's motion for summary adjudication, Kyocera requests that it be awarded damages on its counterclaims and/or set-offs, estimated at present in the amount of at least US$ according to proof, which are expected to be at least US$ 5 million if measured by out-of-pocket costs, and much greater if measured by the extent to which Claimant's actions and inactions diminished the value of Kyocera's investment and profits attributable to the investment.

D.    Motion for Summary Adjudication

Kyocera argues that LaPine forfeited the right to press his claims by delaying this arbitration by sixteen years. The events took place in the 1980s. LaPine filed this arbitration in 1990 for statute of limitation purposes. The final award in the Previous Arbitration was rendered in 1994 and final judicial appeal concerning the Previous arbitration was concluded in August 2003. However, it was not until July 2005 that LaPine announced that he was ready to move on in this arbitration. Kyocera contends that under California statutory and case law : (i) LaPine was required to prosecute his claims expeditiously and that he unreasonably failed to do so; and (ii) that the stays of this arbitration did not relieve LaPine from his obligation to prosecute with reasonable diligence.

In addition, Kyocera argues that even if the allegations in the Updated Request are taken as true, LaPine's Updated Request fails to state a claim as a matter of California law. Specifically, Kyocera contends that all of LaPine's Claims are barred because: (i) LaPine lacks standing to assert them; (ii) LaPine released of all the Claims in writing; and (iii) all of the Claims are barred by principles of waiver and/or estoppel. Kyocera argues that any one of these three separate legal defenses stands as an independent barrier to all of LaPine's Claims.

Kyocera argues that because these threshold defenses raise issues of law that do not require the Tribunal to resolve disputed issues of fact, in the interest of judicial economy and efficiency they should be decided as the first phase of this proceeding.

E.    Relief Sought under the Motion for Summary Adjudication

Kyocera requests the Arbitral Tribunal to dismiss these arbitral proceedings for want of prosecution under California law.

Alternatively, should the Arbitral Tribunal determine that LaPine did not forfeit the right to proceed through his failure to prosecute, Kyocera requests that all of LaPine's claims be dismissed for failure to state a claim under California law under principles of : (i) lack of standing, (ii) release of claims, or (iii) waiver and/or estoppel.

5. Issues to be Determined

Subject to Article 16 of the ICC Rules and the directions of the Arbitral Tribunal, the issues to be determined shall be all issues arising from the submissions, statements and pleadings of the Parties which are relevant and necessary for the adjudication of the Parties' respective claims, counterclaims and defenses.

6. Name and Address of the members of the Arbitral Tribunal

Gerald Aksen Esq.
875 Third Avenue 10th Floor
New York, New York 10022-6225
Telephone: 212 603 2174
Facsimile : 212 829 2001
E-mail: gaksen@thelenreid.com

Graydon S. Staring Esq.
7843 S. Galileo Lane
Tucson, Arizona 85747 U.S.A.
Telephone: 520 647 3192
Facsimile:  520 647 3324
E-mail: starlaw@att.net

Dr. Horacio A. Grigera Naón
2708 35th Place NW
Washington D.C. 20007
USA
Telephones: 202-337-1832
            202-337-1838
Facsimile   : 202-337-1816
E-mail      : hgrigeranaon@verizon.net
              hgrigeranaon@yahoo.com

7. Appointment of the Arbitral Tribunal

By signing these Terms of Reference, the Parties agree that the members of the Arbitral Tribunal have been properly and validly appointed and hereby confirm that neither Party is aware of any ground to challenge such appointment.

8. Seat of the Arbitration

The seat of the arbitration is San Francisco, California, U.S.A..

9. Language of the Arbitration

The language of the arbitration is English.

10. Applicable Procedural Rules

The applicable rules of procedure are the 1988 Rules of Conciliation and Arbitration of the International Chamber of Commerce.

11. Law Applicable to the Merits

All matters regarding the merits submitted to the Arbitral Tribunal shall be governed by the laws of the State of California, U.S.A.

These Terms of Reference, in accordance with Article 13 of the ICC Rules, were drawn up and executed in seven counterparts each of which shall constitute a valid original.

The Parties

Claimant

Signed this 29 day of August 2006.

By

Kyocera

Signed this 1st day of September 2006.

By

The Arbitral Tribunal

Signed this 11th day of September 2006

Gerald Aksen Esq.

Signed this ____ day of _September_ 2006

_Graydon S. Staring_
Graydon S. Staring Esq.


Signed this ____ day of _September_ 2006.


Dr. Horacio A. Grigera Naón