**EXHIBIT 2**

## NOTICE OF PAYMENT AND EXERCISE
## PROCEDURES AND CERTAIN FACTORS

---

### LAPINE HOLDING COMPANY
100 Gold Street
New York, New York  10292

Subordinated Notes Due March 31, 1988
Warrants to Purchase Warrant to Subscribe For
8% Subordinated Convertible Notes

---

### INTRODUCTION

This Notice is furnished to holders of Subordinated Notes Due March 31, 1988 ("Original Notes") and Warrants To Purchase Warrant To Subscribe For 8% Subordinated Convertible Note ("Initial Warrants") of LaPine Holding Company ("Holding") to inform them of the procedures by which they may (1) receive payment on their Original Notes or (2) exercise their Initial Warrants prior to their expiration, if not exercised, on March 31, 1988.  In addition, this Notice describes the business and financial condition of Holding and its wholly owned subsidiary, LaPine Technology Corporation (the "Company"), and other factors which the holders may wish to consider in deciding whether or not to exercise their Initial Warrants.  See the discussion below under the heading "CERTAIN FACTORS."

PAYMENT OF ORIGINAL NOTES IS GUARANTEED BY PRUDENTIAL-BACHE TRADE SERVICES INC. (FORMERLY, PRUDENTIAL-BACHE TRADE CORPORATION) ("PBTC"). PBTC'S GUARANTEE IS GUARANTEED IN TURN BY PRUDENTIAL SECURITIES GROUP INC. ("PSGI").  ALTHOUGH ORIGINAL NOTES MAY BE SURRENDERED FOR PAYMENT ON OR AFTER MARCH 31, 1988, INITIAL WARRANTS WILL EXPIRE AND NO LONGER WILL BE EXERCISABLE AFTER 5:00 P.M. CALIFORNIA TIME ON MARCH 31, 1988. EXERCISE OF AN INITIAL WARRANT REQUIRES THE SURRENDER OF AN ORIGINAL NOTE IN PAYMENT OF THE INITIAL WARRANT'S EXERCISE PRICE.  A HOLDER WHO SURRENDERS AN ORIGINAL NOTE UPON COMPLETE EXERCISE OF AN INITIAL WARRANT WILL NOT RECEIVE PAYMENT ON SUCH ORIGINAL NOTE.  DEPENDING UPON WHETHER A HOLDER DECIDES TO EXERCISE AN INITIAL WARRANT, SURRENDER AN ORIGINAL NOTE FOR PAYMENT OR DO NEITHER OF THE FOREGOING, POTENTIAL RIGHTS SUCH HOLDER MAY HAVE AGAINST HOLDING AND CERTAIN RELATED PARTIES MAY BE ADVERSELY AFFECTED.  FINAL WARRANTS RECEIVED UPON EXERCISE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED WITH THE SECURITIES COMMISSIONER OF ANY STATE OTHER THAN CALIFORNIA, WOULD BE "RESTRICTED SECURITIES" AND WOULD BE SUBJECT TO RESTRICTIONS ON TRANSFER.

---

The date of this Notice is March 16, 1988

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION (WHETHER WRITTEN OR ORAL) OR TO MAKE ANY REPRESENTATION (WHETHER WRITTEN OR ORAL) NOT CONTAINED IN THIS NOTICE AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED. THIS NOTICE DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY A SECURITY IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION. NEITHER THE DELIVERY OF THIS NOTICE NOR ANY DISTRIBUTION OF THE SECURITIES DESCRIBED IN THIS NOTICE SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF HOLDING, THE COMPANY OR THEIR AFFILIATES SINCE THE DATES AS OF WHICH INFORMATION IS GIVEN HEREIN.

THE SECURITIES ISSUABLE UPON EXERCISE OF AN INITIAL WARRANT HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON OR ENDORSED THE MERITS OF EXERCISING AN INITIAL WARRANT OR THE ACCURACY OR ADEQUACY OF THIS NOTICE. ANY REPRESENTATIONS TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE COMMISSION OF CORPORATIONS OF THE STATE OF CALIFORNIA NEITHER ENDORSES NOR RECOMMENDS THE EXERCISE OF INITIAL WARRANTS DESCRIBED IN THIS NOTICE.

TABLE OF CONTENTS

|  | Page |
|---|---|
| BUSINESS | 1 |
| PROPERTIES | 1 |
| LEGAL PROCEEDINGS. | 2 |
|     Kyocera Litigation and Arbitration | 2 |
|     Evans Litigation. | 3 |
|     Other Legal Matters | 4 |
| MARKET FOR HOLDING SECURITIES. | 4 |
| CONSOLIDATED FINANCIAL STATEMENTS | 4 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS. | 5 |
|     Results of Operations | 5 |
|     Liquidity and Capital Resources | 5 |
| ORIGINAL NOTES, INITIAL WARRANTS, FINAL WARRANTS AND CONVERTIBLE NOTES | 6 |
| INSTRUCTIONS FOR PAYMENT OR EXERCISE | 7 |
|     Payment of Original Notes | 8 |
|     Exercise of Initial Warrants. | 9 |
|     Backup Withholding In Connection with Original Notes. | 10 |
|     Validity, Form, and Eligiblity For Payment of Original Notes and Exercise of Initial Warrants | 10 |
|     Lost, Destroyed or Stolen Original Notes or Warrants. | 10 |
|     Risk of Loss. | 10 |
|     Inquiries | 11 |

                                                                    Page

CERTAIN FACTORS  . . . . . . . . . . . . . . . . . . . . . . . .     11

     Relative Risk of Original Notes and Final Warrants  . . . .     11

     Conditions for Exercise of Final Warrant  . . . . . . . . .     11

     No Shareholder Rights . . . . . . . . . . . . . . . . . . .     12

     Effects of Decisions In Connection With Litigation  . . . .     12

FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF SURRENDER OF
     ORIGINAL NOTES FOR PAYMENT AND EXERCISE OF INITIAL WARRANTS. .   12

     Taxable Transaction . . . . . . . . . . . . . . . . . . . .     13

     Original Issue Discount . . . . . . . . . . . . . . . . . .     14

     Capital Gains and Losses  . . . . . . . . . . . . . . . . .     14

     Recharacterization of Transaction; Prior Valuation of
        Initial Warrants  . . . . . . . . . . . . . . . . . . . .    14


Appendix I    - Consolidated Financial Statements of LaPine
                Holding Company

Appendix II   - Description of Final Warrants and Securities
                Issuable Upon Exercise

Appendix III  - Letter of Transmittal to Accompany Subordinated
                Notes Due March 31, 1988 of LaPine Holding Company

01/25/2005 19:26 FAX  4083587110        SEMOTUS SOLUTIONS                    ☑ 005/025

## BUSINESS

Holding was incorporated in Delaware in October 1986. The Company became a wholly owned subsidiary of Holding as a result of the Company's reorganization in December 1986 (the "Reorganization"). The Company was formed for the purpose of designing, developing and marketing 3.5 inch Winchester disk drives (electro-mechanical systems for storing data for microcomputers).

Holding does not conduct any business other than holding all of the outstanding shares of capital stock of the Company. Holding is owned two-thirds by PBTC and its affiliate, Prudential Capital and Investment Services, Inc. ("PCIS"), and one-third by Kyocera Corporation ("Kyocera") and its affiliate, Kyocera (Hong Kong), Ltd.

Following the Reorganization, the Company continued designing, developing and marketing disk drives. Kyocera manufactured the disk drives, and PBTC provided inventory and accounts receivable financing. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION – Liquidity and Capital Resources" and Appendix I – "CONSOLIDATED FINANCIAL STATEMENTS OF LAPINE HOLDING COMPANY – Notes to Consolidated Financial Statements."

However, in the second quarter of 1987 the Company's business deteriorated as it experienced difficulties in obtaining sufficient numbers of disk drives to meet its customers' orders due to a dispute with Kyocera, its sole supplier. See "LEGAL PROCEEDINGS."

In connection with such dispute, the Company initiated a lawsuit against Kyocera in the United States District Court for the Northern District of California (the "District Court") on May 7, 1987. In subsequent arbitration proceedings, Kyocera filed counterclaims against both the Company and Holding. See "LEGAL PROCEEDINGS." After the filing of the lawsuit, the Company's business continued to deteriorate. By July 1987 the Company had terminated a majority of its employees. By November 1987 it had terminated all employees and all operations other than its legal proceedings. In December 1987, the Company disposed of most of its physical operating assets (but retained its lease, technology rights and claims against Kyocera). The Company currently has no plans to resume regular business operations.

## PROPERTIES

As it conducts no business other than holding all of the capital stock of the Company, Holding owns no material physical properties. Until January 1988, the Company leased a facility located at 182 Topaz

Street, Milpitas, California 95035, under a lease expiring in 1990. In January 1988, the Company and the landlord terminated the lease upon payment of $293,530. See "CONSOLIDATED FINANCIAL STATEMENTS OF LAPINE HOLDING COMPANY – Notes to Consolidated Financial Statements."

## LEGAL PROCEEDINGS

During 1987 and 1988, Holding has been a party to several legal proceedings.

### Kyocera Litigation and Arbitration.

In connection with the Company's lawsuit against Kyocera referenced above, the District Court issued a temporary restraining order requiring Kyocera to make certain deliveries of product through early June 1987. In connection with its order, the District Court required PBTC to guarantee payment to Kyocera for such product deliveries as Kyocera argued that it was unsure that the Company would pay for such product deliveries. Following the entry of the temporary restraining order, the parties met but were unable to resolve matters. On September 2, 1987 the District Court ordered the arbitration of the Company's claims. Accordingly, on October 30, 1987 the Company, PBTC and PCIS filed a request for arbitration with the International Chamber of Commerce in Paris, France (the "Request for Arbitration").

In the Request for Arbitration, the Company, PBTC and PCIS alleged six causes of action against Kyocera arising out of the Reorganization and Kyocera's performance as the manufacturer of the Company's products. The causes of action alleged are: (1) breach of the Reorganization agreement, (2) wrongful denial of obligation of contract, (3) deceit, (4) breach of the supply agreements, (5) breach of the covenant of good faith and fair dealing and (6) appropriation of the Company's proprietary information. The Company, PBTC and PCIS, seek in excess of $100 million in damages from Kyocera, of which approximately $35 million are compensatory in nature.

On February 1, 1988, the Company received Kyocera's counterclaims and answer to the Request for Arbitration. In its answer, Kyocera denied the allegations of the Company, PBTC and PCIS. Kyocera added Holding as a party and asserted counterclaims against the Company, PBTC and PCIS for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud and (4) indemnity. Kyocera also asserted counterclaims against PBTC and PCIS for inducement of breach of contract and conspiracy, and against the Company, Holding and PBTC for securities fraud. Kyocera seeks actual damages in excess of $6.2 million and unspecified punitive damages.

-2-

Holding intends to defend against Kyocera's counterclaims vigorously. The Company intends to press its case against Kyocera vigorously and also to defend against Kyocera's counterclaims vigorously. Arbitrators have not yet been chosen and no date for a hearing has been set.

It is impossible at this early stage to estimate with any degree of accuracy the amount of any recovery by the Company should it prevail or the maximum exposure, if any, to Holding or the Company in this arbitration should Kyocera prevail.

Evans Litigation.

On November 23, 1987 a lawsuit was filed in the District Court against Holding, the Company and several other defendants by Thomas M. Evans, Jr., a shareholder of the Company prior to the Reorganization and subsequently a holder of an Original Note and an Initial Warrant, in connection with the Reorganization and the operations of the Company thereafter. The other defendants included PSGI, several of its affiliated companies and their lawyers (collectively the "Prudential Group"), Kyocera, one of its affiliated companies and four individuals who served as officers and/or directors of the Company and/or Holding.

Plaintiff designated the suit both a class action against all defendants on behalf of himself and all other former shareholders of the Company who received cash, Original Notes and Initial Warrants in the Reorganization and as a shareholder derivative action on behalf of Holding and the Company against the other defendants. Plaintiff sought compensatory damages in the amount of $22.5 million against all defendants, punitive damages of $50 million against the Prudential Group, the same damages against Kyocera and declaratory relief.

On February 19, 1988 the District Court dismissed all of the shareholder derivative claims alleged by plaintiff on behalf of Holding and the Company against the other defendants permanently and, without leave to re-allege those claims. On that same date the District Court dismissed the remainder of plaintiff's claims (alleging fraud under California and federal securities laws, state law deceit and fraud, violation of California laws regarding securities permits, breach of contract, and breach of a covenant of good faith and fair dealing and declaratory relief) in connection with the Reorganization and certain other matters with leave for plaintiff to restate the claims in an amended complaint. In early March 1988, plaintiff filed an amended complaint restating such claims. Discovery in the case is proceeding.

-3-

Also on February 19, 1988 the District Court denied plaintiff's request for tentative approval of a settlement of the alleged class claims against Kyocera and several of its affiliated parties. The District Court also scheduled a hearing for May 27, 1988, to consider cross-motions by plaintiff and by defendants for summary judgment.

Holding, the Company and their affiliated defendants intend to defend such action vigorously. It is impossible at this stage to estimate with any degree of accuracy the maximum exposure to Holding or the Company, if any, in connection with any such litigation.

Other Legal Matters.

As of December 31, 1987, accounts receivable in an aggregate amount of approximately $1,600,00 were outstanding. The Company has instituted and in the future may institute further legal proceedings to effect collection of such accounts receivable. Holding has been informed that in January 1988, PBTC received a letter from a former shareholder of the Company advising that he or another group of former shareholders of the Company were considering bringing a lawsuit on grounds similar to those of Mr. Evans. To Holding's knowledge, no such suit has been filed as of the date of this Notice.


## MARKET FOR HOLDING SECURITIES

No established public trading market currently exists for any of Holding's securities. No market for such securities, including Final Warrants (as defined herein), is expected to arise in the future. See "ORIGINAL NOTES, INITIAL WARRANTS, FINAL WARRANTS AND CONVERTIBLE NOTES."

In connection with the Reorganization, Holding issued an option to purchase common stock of Holding (the "Option") to Pru-Tech Research and Development Partnership ("Pru-Tech"). PBTC agreed with Pru-Tech to purchase the Option for $500,000 at Pru-Tech's election. In early March 1988, Pru-Tech notified PBTC of its election to require PBTC to purchase the Option.


## CONSOLIDATED FINANCIAL STATEMENTS

See Appendix I for the unaudited consolidated financial statements of Holding as of December 31, 1987 (the "Financial Statements"). Because of the undue burden and expense that would be required in their preparation and because they would not be available in any case in time for inclusion in this Notice, audited financial statements for either the Company or Holding have not, and will not, be prepared.

-4-

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

As a result of the Reorganization, the Company became a wholly
owned subsidiary of Holding.    The Financial Statements reflect the
operations of Holding and the Company on a consolidated basis through
December 31, 1987.    This discussion should be read in conjunction with
the Financial Statements.

Results of Operations.

Holding has conducted no operations other than holding all of
the capital stock of the Company and legal proceedings in connection
with such holding.    In connection with its start-up and operations prior
to the Reorganization, the Company incurred substantial losses.    The
Company's net losses for the years ended December 31, 1985 and 1986,
respectively,    were    $10,472,000    and    $12,901,000.    Following    the
Reorganization, the Company obtained increasing orders for its products
in the first quarter of 1987.    However, the Company was not able to
obtain sufficient product to meet its customers' requirements and began
to lose customers and orders.    From January to July 1987 the shortfall in
product exceeded 114,236 units which resulted in an estimated revenue
loss to the Company of over $23 million.

In July 1987 the Company terminated all but 13 of its 100
employees.    The remaining employees were retained through October 1987;
they were engaged in making sales of products, collecting receivables and
attempting to sell the Company's fixed assets and finished goods and
spare parts inventory.    In November 1987 the Company retained a
consultant to oversee the collection of receivables and disposition of
assets.

The Company currently does not intend to conduct operations in
the future other than legal proceedings.

The Company's net loss for the year ended December 31, 1987 was
$7,576,600, and at such date, the Company had a retained stockholder's
deficiency of $22,590,600.

Liquidity and Capital Resources.

The Company does not have sufficient cash resources to meet its
needs.    After the Reorganization, PBTC provided most of the Company's
liquidity and capital resources by providing financing pursuant to a
financing agreement of $10 million or more for the purchase of disk
drives from Kyocera and for working capital.    The Company has not been
able to identify additional outside sources of funds.

-5-

At December 31, 1987, the Company's current liabilities exceeded its current assets by $15,890,600. Of its current liabilities, $11,771,000 was owed to PBTC and its affiliates pursuant to their financing arrangements with the Company, and to Kyocera for products purchased by the Company. It is Company's position that the amount due Kyocera is $4,873,000. However, in the arbitration Kyocera claims $6,202,045 is owing for such delivered product.

Because of the Company's and Holding's financial condition, Holding will not have sufficient funds to pay the Original Notes (which were issued in the principal amount of $4 million) when they become due on March 31, 1987. PBTC unconditionally guaranteed the payment of the principal amount of the Original Notes. PBTC's guarantee is guaranteed in turn by PSGI. Holding has been advised that PBTC and/or PSGI will deposit a total of $4 million with the Trustee under the Indenture (both terms as defined below) for payment of the Original Notes. At December 31, 1987, the aggregate amount of all funds invested in, or advanced or loaned by PBTC and its affiliates to, and obligations undertaken by them on behalf of, Holding and/or the Company was in excess of $31 million.

The Company may recover an award in its arbitration against Kyocera. See "LEGAL PROCEEDINGS." Although the Company, together with other claimants, seeks damages in excess of $100 million from Kyocera, of which approximately $35 million is claimed for damages which are compensatory in nature, it is impossible to estimate at this time the actual amount of the award, if any, and the Company's share thereof, if such claimants should prevail. Even if the Company were to recover an award, it is unlikely that the Company would resume business operations.

If the Company did recover an award, holders would not necessarily receive any of the proceeds. PBTC and PCIS have the power and authority to cause the dissolution of the Company under the corporate laws of the State of California. UPON SUCH DISSOLUTION, ALL FINAL WARRANTS WOULD TERMINATE AND THE HOLDERS THEREOF WOULD RECEIVE NOTHING. PBTC and PCIS have advised Holding that they have not at this time determined whether they would cause the dissolution of the Company upon the Company's prevailing in the arbitration or under any other circumstances, and they reserve the right to make such determination in their sole discretion.

### ORIGINAL NOTES, INITIAL WARRANTS, FINAL WARRANTS AND CONVERTIBLE NOTES

Pursuant to the merger effected as part of the Reorganization, each share of the Company's then outstanding Common Stock was converted into the right to receive (1) approximately $0.06 in cash, (2) an

-6-

Original Note in the principal amount of approximately $0.34, and (3) an Initial Warrant. Original Notes and Initial Warrants were issued under an Indenture (the "Indenture") between Holding and Bishop Trust Company, Limited (the "Trustee").

THE MATURITY DATE OF THE ORIGINAL NOTES IS MARCH 31, 1988. PAYMENT OF ORIGINAL NOTES IS GUARANTEED BY PBTC. PBTC'S GUARANTEE IS GUARANTEED IN TURN BY PSGI. EACH HOLDER WHO SURRENDERS AN ORIGINAL NOTE FOR PAYMENT, AS PROVIDED HEREIN, WILL RECEIVE THE FACE AMOUNT OF SUCH ORIGINAL NOTE WITHOUT INTEREST.

INITIAL WARRANTS ARE EXERCISABLE AT ANY TIME PRIOR TO, AND WILL EXPIRE AT, 5:00 P.M. CALIFORNIA TIME ON MARCH 31, 1988 (OR EARLIER UNDER CERTAIN LIMITED CIRCUMSTANCES). A HOLDER MAY (1) SURRENDER THE HOLDER'S ORIGINAL NOTE FOR PAYMENT ON OR AFTER MARCH 31, 1988, (2) EXERCISE THE HOLDER'S INITIAL WARRANT BEFORE EXPIRATION ON MARCH 31, 1988 OR (3) DO NEITHER. ALTHOUGH ORIGINAL NOTES MAY BE SURRENDERED FOR PAYMENT AFTER MARCH 31, 1988, INITIAL WARRANTS WILL EXPIRE AT 5:00 P.M. CALIFORNIA TIME (3:00 P.M. HAWAII TIME) ON MARCH 31, 1988 AND NO LONGER WILL BE EXERCISABLE AFTER THAT TIME.

Holders of Initial Warrants may, on surrender of Original Notes in payment of the exercise price, obtain other warrants ("Final Warrants"). The holder of each Final Warrant would, in turn, under limited conditions WHICH MAY NEVER OCCUR, be entitled to acquire 8% Subordinated Convertible Notes of Holding in a face amount equal to 3.75 times the face amount of the Original Notes surrendered on exercise of Initial Warrants. If issued, Convertible Notes would be convertible under certain circumstances into common stock of Holding. See Appendix II - "DESCRIPTION OF THE FINAL WARRANTS AND SECURITIES ISSUABLE UPON EXERCISE."

BECAUSE IT IS HOLDING'S VIEW THAT THE EVENTS WHICH DETERMINE THE EXERCISABILITY OF THE FINAL WARRANTS ARE UNLIKELY TO OCCUR, IT IS ALSO HOLDING'S VIEW THAT ANY FINAL WARRANTS WOULD LIKELY EXPIRE WITHOUT EVER BECOMING EXERCISABLE AND THAT, AS A RESULT, THE HOLDERS OF FINAL WARRANTS WOULD MOST PROBABLY RECEIVE NOTHING. SEE "CERTAIN FACTORS." HOLDERS SHOULD CAREFULLY REVIEW THE CONDITIONS UNDER WHICH FINAL WARRANTS WOULD BECOME EXERCISABLE PRIOR TO DECIDING WHETHER TO EXERCISE THEIR INITIAL WARRANTS.

INSTRUCTIONS FOR PAYMENT OR EXERCISE

Pursuant to the Indenture, Holding has acted as the Registrar of the Original Notes and Initial Warrants from December 24, 1986 until March 16, 1988. During that time, Holding maintained, and has been

-7-

solely responsible for, the register listing the holders of Original Notes and Initial Warrants and furnished to the Trustee lists identifying the holders of Original Notes and Initial Warrants. Pursuant to that certain letter dated March 16, 1988, Holding instructed the Trustee to assume the responsibilities as Registrar and Paying Agent in accordance with the terms of the Indenture.

Payment of Original Notes and exercise of Initial Warrants will be effected through the Trustee as Paying Agent and Registrar for Holding in accordance with the terms of the Indenture. The procedure for holders to follow in obtaining payment of their Original Notes or to exercise their Initial Warrants are set forth below. UNLESS OTHERWISE EXPRESSLY INSTRUCTED BY HOLDING, DO NOT SEND ANY DOCUMENTS TO HOLDING.

Payment of Original Notes.

On or prior to March 31, 1988, the sum of $4.0 million (the "Fund") will be deposited with the Trustee, as Paying Agent for Holding, to pay the Original Notes. To receive payment of an Original Note, (1) a properly completed and duly executed transmittal letter (a form of which is attached as Appendix III to this Notice), (2) a properly completed and duly executed Form W-9 (where applicable) and (3) a certificate for an Original Note must be received by the Trustee at 1000 Bishop Street, Room 409, Corporate Trust Department, Honolulu, Hawaii 96813, Attention: Astika Botejue, on or before March 31, 1989 (the "Return Date"). After the Return Date, payment of the Original Notes will be made by Holding in accordance with the procedure set forth below. Endorsement of the Original Note is not required.

A transmittal letter and Form W-9 for use by holders are enclosed herewith. The signature (signatures, in the case of an Original Note owned by two or more joint holders) on the transmittal letter should correspond exactly to the name(s) as written on the face of the Original Note transmitted. If a letter of transmittal is signed by a trustee, executor, administrator, guardian, officer of a corporation, attorney-in-fact, or in any other representative or fiduciary capacity, the person signing must give such person's full title in such capacity and appropriate evidence or authority to act in such capacity must be forwarded with the transmittal letter and Original Note. If additional documents are required by the Trustee, such person will be so advised. Endorsement of the Original Note is not required.

Payment of the Original Notes will be made as soon as practicable after March 31, 1988. No interest shall be paid to holders with respect to the Original Notes or the Fund. Any portion of the Fund that remains unclaimed after the Return Date shall be delivered to Holding upon demand. Any holders of Original Notes who do not surrender

-8-

their Original Notes for payment prior to the Return Date shall thereafter look only to Holding for payment of their Original Notes, without any interest thereon, subject to any withholding or backup withholding taxes, if any.

Exercise of Initial Warrants.

Each holder of an Initial Warrant is entitled to exercise either 50% or 100% (but only 50% or 100%) of such Initial Warrant. In order to exercise an Initial Warrant, and thus to receive a Final Warrant, the holder must surrender to the Trustee at 1000 Bishop Street, Corporate Trust Department, Room 409, Honolulu, HI 96804, Attention: Astika Botejue, at any time prior to 5:00 P.M. California time (3:00 P.M. Hawaii time) on March 31, 1988 the Initial Warrant, together with a properly filled in, dated and signed by the registered holder, Form of Subscription and unpaid Original Note. A Form of Subscription is annexed to each Initial Warrant. A holder who exercises 50% of an Initial Warrant also should deliver to the Trustee a completed Form W-9, where applicable. (A Form W-9 for use by such holders is enclosed herewith.) Holders should NOT include a transmittal letter. The signature (signatures, in the case of an Initial Warrant owned by two or more joint holders) on the Form of Subscription should correspond exactly to the name(s) as written on the first page of the Initial Warrant transmitted. If a Form of Subscription is signed by a trustee, executor, administrator, guardian, officer of a corporation, attorney-in-fact, or in any other representative or fiduciary capacity, the person signing must give such person's full title in such capacity and appropriate evidence or authority to act in such capacity must be forwarded with the Form of Subscription. If additional documents are required by the Trustee, such person will be so advised.

The exercise price of an Initial Warrant is $1 for each $3.75 of the principal amount of the Convertible Note for which the Final Warrant may be exercisable. See Appendix II - "DESCRIPTION OF FINAL WARRANTS AND SECURITIES ISSUABLE UPON EXERCISABLE." If only 50% of the Initial Warrant is exercised, the balance of the Initial Warrant will be cancelled, and the holder will be deemed to have been issued an Original Note in a principal amount equal to the excess of the surrendered Original Note over the Initial Warrant exercise price and will be sent payment on such amount as soon as practicable after March 31, 1988 as if such holder had surrendered such new Original Note for payment. A HOLDER WHO EXERCISES 100% OF AN INITIAL WARRANT WILL NOT RECEIVE PAYMENT ON THE ORIGINAL NOTE SURRENDERED ON EXERCISE.

Backup Withholding in Connection With Original Notes.

Under the U.S. federal backup withholding rules, unless an exception applies under the applicable law and regulations, the Trustee will be required to withhold 20% of all or a portion of the amount otherwise payable to a holder under an Original Note unless the holder provides his tax identification number (employer identification number or social security number) and certifies that such number is correct and that he or she is not subject to backup withholding as a result of failure to report all interest or dividends. Therefore, unless such an exception exists and is proved in a manner satisfactory to the Trustee, each holder should complete, sign and return to the Trustee the Form W-9 enclosed herewith, so as to provide the information and certification necessary to avoid backup withholding. Certain holders (including, among others, all corporations and certain foreign individuals) are not subject to these backup withholding and reporting requirements.

Validity, Form, and Eligibility For Payment of Original Notes and Exercise of Initial Warrants.

All issues as to the validity, form, and eligibility (including time of receipt) of deliveries of Original Notes for payment or deliveries of Initial Warrants for exercise shall be resolved by Holding, whose determination will be final and binding. Holding reserves the absolute right to reject any and all deliveries not in proper form. Holding also reserves the absolute right to waive any defect or irregularity in the delivery of any Original Notes or Initial Warrants. None of Holding, the Trustee or any other person will be under any duty to give notification of any defects or irregularities in deliveries or incur any liability for failure to give any such notification.

Lost, Destroyed or Stolen Original Notes or Warrants.

In the event an Original Note or Initial Warrant has been lost, destroyed or wrongfully taken, the holder must provide (1) an indemnity agreement, a copy of which may be obtained from Holding by writing to Holding at 100 Gold Street, New York, NY 10292, Attn: Secretary, or (2) if reasonably required by the Trustee or Holding, an indemnity bond for security in lieu of an indemnity agreement. In such event, the holder will be notified in writing after the holder submits an executed indemnity agreement and appropriate information regarding such Original Note or the Initial Warrant, as the case may be.

Risk of Loss.

It is recommended that holders mail all documents, including the Original Notes and transmittal letters, Initial Warrants and Forms of

Subscription, and Form W-9's, by insured or certified mail (return receipt requested) as a precaution against loss. Sufficient time should be allowed to assure timely delivery. Delivery of Original Notes and Initial Warrants shall be effective, and risk of loss of and title to such Original Notes and Initial Warrants shall pass only upon proper delivery to and receipt by the Trustee. Delivery is at the risk of the surrendering holders.

Inquiries.

All inquiries with regard to the surrender of Original Notes for payment or the exercise of Initial Warrants and any request for additional transmittal letters should be made directly to the Trustee at 1000 Bishop Street, Corporate Trust Department, Room 409, Honolulu, HI 96804, Attention: Astika Botejue, Telephone: (808)-523-2195. 523-2111
Bern

All other questions may be addressed by telephone to Mr. Timothy Parker (415) 984-3074 during regular business hours or to Mr. Parker by mail at P.O. Box 2228, San Francisco, California 94126-2228.

## CERTAIN FACTORS

In connection with deciding whether to surrender an Original Note for payment, to exercise an Initial Warrant to obtain a Final Warrant or to take neither of the foregoing actions, the following factors should be considered in addition to the information provided elsewhere in this Notice and the documentation provided herewith:

### Relative Risk of Original Notes and Final Warrants.

Payment of Original Notes is guaranteed by PBTC. PBTC's guarantee is guaranteed in turn by PSGI. PBTC and PSGI have advised the Company that PBTC and/or PSGI will deposit funds with the Trustee under the Indenture for payment of the Original Notes. Upon exercise of an Initial Warrant, the holder would be surrendering an Original Note guaranteed as to payment for a Final Warrant which (1) is not readily transferable, (2) is not exercisable except under limited circumstances, which may never occur, and (3) may expire without ever becoming exercisable, in which case the holder would receive nothing.

### Conditions for Exercise of Final Warrant.

Final Warrants would become exercisable only under certain limited circumstances. See Appendix II — "DESCRIPTION OF THE FINAL WARRANTS AND SECURITIES ISSUABLE UPON EXERCISE." Based on the business and financial condition of the Company, it is Holding's view that it is

-11-

not likely that the conditions for exercise of the Final Warrants would be satisfied prior to the date of expiration of Final Warrants. See "BUSINESS," "FINANCIAL STATEMENTS" and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS." Therefore, it is Holding's view that the Final Warrants probably would never become exercisable and the Convertible Notes which would be issuable only upon exercise of the Final Warrants would never be issued. If a Final Warrant expires before it becomes exercisable, its holder would receive nothing. In fact, because of the remote likelihood that the Final Warrants would ever be exercisable, any Final Warrants issued may never have any significant value, or any value at all.

<u>No Shareholder Rights</u>.

Holders of Final Warrants will not have any right to participate in, or to receive assets upon, the dissolution or liquidation of Holding or of the Company and will not be entitled to any voting rights or other rights as shareholders of Holding.

<u>Effects of Decisions In Connection with Litigation</u>.

HOLDING, COMPANY AND THEIR AFFILIATES MAY TAKE THE POSITION IN LITIGATION INVOLVING CLAIMS BASED ON MISREPRESENTATION OR FAILURE TO DISCLOSE IN THE SALE OF INITIAL WARRANTS, AMONG OTHER MATTERS, SUCH AS THE <u>EVANS</u> LITIGATION, THAT DEPENDING UPON WHETHER A HOLDER DECIDES TO EXERCISE AN INITIAL WARRANT, SURRENDER AN ORIGINAL NOTE FOR PAYMENT OR DO NEITHER OF THE FOREGOING, THE NATURE OF SUCH HOLDER'S CLAIM OR THE NATURE OR EXTENT OF DAMAGES RECOVERABLE IN SUCH LITIGATION MAY BE ADVERSELY AFFECTED BY SUCH DECISION. SEE "LEGAL PROCEEDINGS." HOLDERS ARE ADVISED TO CONSULT WITH THEIR LEGAL ADVISERS WITH REGARD TO SUCH POTENTIAL EFFECTS.

FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF SURRENDER
OF ORIGINAL NOTES FOR PAYMENT AND EXERCISE OF INITIAL WARRANTS

The following is a general description of the major federal income tax consequences to individual holders of Original Notes and Initial Warrants of (1) surrendering Original Notes for payment, (2) exercising Initial Warrants or (3) taking neither of the foregoing actions. The discussion below is based on the assumptions that (1) Original Notes, Initial Warrants, Final Warrants and Convertible Notes will be treated as separate instruments for federal income tax purposes, and (2) the fair market value of Initial Warrants was ascertainable prior to the end of 1986. See "Recharacterization of Transaction; Prior Valuation of Initial Warrants" below.

01/25/2005 19:30 FAX  4083587110              SEMOTUS SOLUTIONS                                    ☑017/025

THE TAX CONSEQUENCES TO EACH HOLDER OF SURRENDERING ORIGINAL
NOTES FOR PAYMENT OR EXERCISING INITIAL WARRANTS MAY VARY DEPENDING ON
PARTICULAR FACTS AND CIRCUMSTANCES, INCLUDING TAX ELECTIONS MADE AND
POSITIONS TAKEN BY THE HOLDER AT THE TIME OF ACQUISITION PURSUANT TO THE
REORGANIZATION.   ACCORDINGLY, INDIVIDUAL HOLDERS SHOULD CONSULT WITH
THEIR TAX ADVISORS TO DETERMINE THE APPLICATION OF FEDERAL, STATE, LOCAL
OR OTHER TAX LAWS TO THEIR PARTICULAR SITUATIONS.  THIS DISCUSSION IS NOT
ADDRESSED TO HOLDERS THAT ARE CORPORATIONS OR OTHER ENTITIES AND SUCH
HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS FOR TAX ADVICE WITH RESPECT
TO SURRENDER OF ORIGINAL NOTES FOR PAYMENT OR EXERCISE OF INITIAL
WARRANTS.

Taxable Transaction.

        Each holder of an Original Note will have a taxable transaction
in 1988 with respect to such Original Note.  A holder who allows an
Initial Warrant to lapse will also have a taxable transaction with
respect to such Initial Warrant.

        A holder who surrenders an Original Note for payment will
recognize gain or loss measured by the difference between the amount of
money received and the holder's adjusted tax basis in such Original
Note.  A holder who takes no action with respect to an Original Note by
March 31, 1988 will be treated for federal income tax purposes as having
surrendered an Original Note for payment and received payment on March
31, 1988.  A holder who surrenders (or is treated as having surrendered)
an Original Note for payment will also have a taxable loss on the lapse
of the holder's Initial Warrant.  The amount of such loss will be equal
to the amount of the holder's tax basis in such Initial Warrant.

        A holder who surrenders an Original Note upon the exercise of an
Initial Warrant will recognize gain or loss measured by the difference
between the fair market value of such Original Note at the time of the
surrender and the holder's adjusted tax basis in such Note.  Because the
Original Note can be surrendered for payment in full, it is likely that
the fair market value of an Original Note will be equal to its face
amount.

        Each holder must separately determine the amount of the holder's
adjusted tax basis in the Original Note and Initial Warrant received
pursuant to the Reorganization, since the amount of such basis will
depend on tax elections made and positions taken by the holder in
connection with the Reorganization.

Original Issue Discount.

Although Original Notes do not bear interest, the "original issue discount" rules require their holders to treat a portion of the amount payable under Original Notes as interest income for federal income tax purposes in 1987 and 1988. Holding will report the amount of original issue discount for each year to each holder and to the Internal Revenue Service. The original issue discount rules provide for adjustments to the holder's tax basis in the holder's Original Note so that amounts reported as interest income will not be again taxable when collected.

Capital Gains and Losses.

Gain or loss from the disposition of Original Notes and any loss from the lapse of an Initial Warrant will be capital gain or loss if such Original Notes and Initial Warrants were capital assets in the holder's hands at the time of the disposition. In the case of holders who are reporting their gains from the Reorganization under the installment method, an Original Note and Initial Warrant will be treated as capital assets if the shares of Company stock for which the holder received such Original Note and Initial Warrant pursuant to the Reorganization were held as capital assets at the time of the closing of the Reorganization.

In general, a taxpayer who recognizes capital gains and capital losses must combine all such gains and losses recognized during the year to arrive at a net capital gain or capital loss. A net capital gain must be included in full in income and is taxed at regular income tax rates. A net capital loss can be deducted from other income only to the extent of $3,000. Capital losses that are not deductible because of the $3,000 limitation may be carried forward and deducted in future years, subject to the limitations applicable in such future years.

Recharacterization of Transaction; Prior Valuation of Initial Warrants.

The foregoing discussion describes the major federal income tax consequences of disposition of Original Notes based on the assumption that the Original Notes, Initial Warrants, Final Warrants and Convertible Notes will be recognized as separate instruments and taxed as such. The Internal Revenue Service may contend that one or more of these instruments should be aggregated or recharacterized for tax purposes. If such a contention were made and upheld, the tax consequences, including the amount and timing of the income reportable as a result of the Reorganization, the results of the exercise of Initial and Final Warrants or of the collection of amounts due under Original Notes and Convertible Notes, could be different from the results described in this section.

The foregoing discussion is further based on the assumption that Initial Warrants had an ascertainable fair market value prior to the end of 1986. A holder who took the position that the Initial Warrants did not have an ascertainable fair market value in 1986 but who exercises an Initial Warrant in 1988 may recognize taxable gain on the exercise in addition to the gain described under the heading "Taxable Transaction."

APPENDIX I
to Notice

CONSOLIDATED FINANCIAL STATEMENTS OF
LAPINE HOLDING COMPANY

01/25/2005 19:32 FAX   4083587110          SEMOTUS SOLUTIONS                                    ☑021/025

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
OF LAPINE HOLDING COMPANY

|                                                                      | Page No. |
|----------------------------------------------------------------------|----------|
| Consolidated Balance Sheets as of December 31, 1987 and December 31, 1986 | F-1 |
| Consolidated Statements of Operations for Two Years Ended December 31, 1987 | F-2 |
| Notes to Consolidated Financial Statements                           | F-3      |

LAPINE HOLDING COMPANY AND SUBSIDIARY

Consolidated Balance Sheets
(Unaudited)

| | December 31 | |
|---|---|---|
| | 1987 | 1986 |
| **Assets** | | |
| Current assets: | | |
| Cash | $ 608,700 | $ 1,563,000 |
| Receivables | 978,000 | 3,897,000 |
| Inventories | --- | 2,375,000 |
| Prepaid expenses | --- | 57,000 |
| Total current assets | 1,586,700 | 7,892,000 |
| Property and equipment | --- | 952,000 |
| Lease deposits and other assets | --- | 119,000 |
| | 1,586,700 | 8,963,000 |
| **Liabilities and Stockholders' Deficiency** | | |
| Current liabilities: | | |
| Current portion of long-term debt | 4,724,000 | 1,692,000 |
| Accounts payable | 482,300 | 1,239,000 |
| Accrued expenses | 500,000 | 625,000 |
| Payables to PBTC and Kyocera | 11,771,000 | 8,396,000 |
| Total current liabilities | 17,477,300 | 11,952,000 |
| Long-term debt, less current portion | 6,700,000 | 11,831,000 |
| Other | --- | 194,000 |
| Stockholders' deficiency: | | |
| Preferred stock | 7,500,000 | 7,500,000 |
| Common stock | 1,800,000 | 1,800,000 |
| Accumulated deficit | (31,890,600) | (24,314,000) |
| Net stockholders' deficiency | (22,590,600) | (15,014,000) |
| | $ 1,586,700 | $ 8,963,000 |

See accompanying notes to consolidated financial statements.

F-1

LAPINE HOLDING COMPANY AND SUBSIDIARY

Consolidated Statements of Operations
(Unaudited)

|  | Year Ending December 31 | |
|  | 1987 | 1986 |
|---|---|---|
| Net Sales | $26,435,600 | $17,735,000 |
| Cost of Sales | (23,214,700) | (21,044,000) |
| Earnings/(Loss) on revenues | 3,220,900 | (3,309,000) |
| Operating expenses: | | |
| Research and development | 3,684,100 | 3,202,000 |
| Marketing and sales | 2,013,500 | 1,819,000 |
| General and administrative | 2,373,035 | 2,618,000 |
|  | (8,070,635) | (7,639,000) |
| Operating Loss | (4,849,735) | (10,948,000) |
| Other expenses: | | |
| Expenses related to reorganization | - - - | (552,000) |
| Interest expense, net | (1,937,216) | (1,401,000) |
| Loss on disposal of assets | (789,649) | - - - |
|  | (2,726,865) | (1,953,000) |
| Net Loss | $(7,576,600) | $(12,901,000) |

See accompanying notes to consolidated financial statements.

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements

1. Accounting Policies

    (a) Basis of Presentation

    The consolidated financial statements include the results of
    LaPine Holding Company ("Parent") and its wholly owned
    subsidiary, LaPine Technology Corporation (the "Subsidiary").
    The Subsidiary was incorporated in August 1984 and engages in
    the development and marketing of 3.5 inch Winchestor disk
    drives. Parent, which was formed to effect the reorganization
    of the Subsidiary described in note 2, was incorporated in
    October 1986.

    (b) Inventories

    Inventories are stated at the lower of cost (first-in, first-out
    method) or market (net realizable value). Inventories are
    recorded when Kyocera Corporation ("Kyocera"), a stockholder and
    the manufacturer of the Company's products, shipped the product
    from its warehouse.  Inventories consisted primarily of finished
    disk drives.

    (c) Property and Equipment

    Property and equipment is stated at cost for purchased assets
    and the lower of fair value or the present value of the related
    minimum lease payments at lease inception for assets recorded
    under capital leases. Depreciation and amortization is provided
    on the straight-line method over the estimated useful lives of
    the respective assets, generally five years.

    (d) Revenue Recognition

    Revenues from product sales are recognized upon shipment.

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements - Continued

(e) Related Parties

The relationships of Parent with its primary related parties, Prudential-Bache Trade Services, Inc. (formerly Prudential-Bache Trade Corporation) ("PBTC"), Prudential Capital and Investment Services, Inc. ("PCIS"), Kyocera and Kyocera (Hong Kong), Ltd., are summarized as follows:

° PBTC, PCIS, Kyocera and Kyocera (Hong Kong), Ltd. are the stockholders of Parent;

° PBTC holds several of the notes payable and has guaranteed several of the obligations described in note 9 and is due significant trade payables pursuant to its Financing Agreement described in note 14; and

° Kyocera is the manufacturer of the Subsidiary's products and a party to the Amended Technology Transfer and Manufacturing Agreement described in note 13.

2. Reorganization

The Subsidiary was reorganized on December 29, 1986. Pursuant to such reorganization, Parent acquired the common stock of the Subsidiary from its former stockholders for $2,500,000 cash, and the notes and warrants described in note 9. Pursuant to this reorganization, the related parties (note 1(e)) consummated the following transactions:

° PBTC and Kyocera contributed $5,500,000 to the combined entity and were issued all of Parent's common stock.

° Shortly after the reorganization, PBTC transferred the majority of its common and preferred stock of Parent to PCIS.

° Shortly after the reorganization, Kyocera transferred approximately 15% of its shares of common stock of Parent to Kyocera (Hong Kong), Ltd.

° PBTC, Parent and the Subsidiary agreed to restructure $15,000,000 of the Subsidiary's trade debt into $7,500,000 of the Subsidiary's long-term debt (note 9) and $7,500,000 of Parent's preferred stock (note 11).

F-4

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements – Continued

° Pru-Tech Research and Development Partnership, for whom the Subsidiary previously performed research and development services ("Pru-Tech") contributed its right to receive future royalties under its license agreement with the Subsidiary, assigned its ownership rights in the Subsidiary's base technology to the Parent, cancelled $467,000 in accrued royalties due from the Subsidiary, received a $2,000,000 cash payment from Parent and received a warrant to purchase up to 1,500,000 shares of Parent's common stock (note 12).

° $300,000 in notes, together with $26,000 in accrued interest, due to Pru-Tech from the Subsidiary were assumed by PBTC.

° Kyocera assigned to the Subsidiary all of its rights in certain of Subsidiary's technology (note 13).

° The Subsidiary's former president entered into a five year consulting/covenant-not-to-compete agreement with the Subsidiary. PBTC agreed to fund certain of the obligations under that agreement.

As a result of these transactions, ownership of technology was centralized into one entity which received financial support through the infusion of capital, restructuring of debt and extinguishment of royalty commitments. Such transactions have been reflected in the accompanying financial statements primarily as capital transactions between shareholders of the combined entity.

3. Termination of Operations

In July 1987, the Subsidiary terminated all but 13 of its employees due to a lack of product. By November 1987, the Subsidiary had terminated all employees and all operations other than its legal proceedings.

4. Legal Proceedings

The Subsidiary, Parent and certain of their affiliates are parties to an arbitration now pending with Kyocera arising out of the December 1986 reorganization (note 2) and Kyocera's performance as manufacturer of the Subsidiary's products. The Subsidiary, PBTC and PCIS seek in excess of $100 million in damages from Kyocera, of which approximately $35 million are compensatory in nature. Kyocera seeks damages in excess of $6.2 million from the Subsidiary, Parent and PBTC.

F-5

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements — Continued

The Subsidiary, Parent and certain of their affiliates (the "Prudential Group") and Kyocera are defendants in a lawsuit, designated as both a class action and a shareholders derivative action when originally filed, that was filed in November 1987 in federal court by Thomas M. Evans, Jr., a shareholder of the Subsidiary prior to the December 1986 reorganization. Plaintiff sought $22.5 million against all defendants and punitive damages in excess of $50 million against the Prudential Group and the same damages against Kyocera and declaratory relief.

No provision has been made for any possible adverse determination in these proceedings.

5. Receivables

A summary of receivables follows:

|  | December 31 | |
|---|---|---|
|  | 1987 | 1986 |
| Trade receivables | $2,641,000 | $6,420,000 |
| Due from shareholder | 542,000 | --- |
| Less allowance for doubtful accounts and sales returns | (2,205,000) | (2,523,000) |
|  | $ 978,000 | $3,897,000 |

All trade receivables are the subject of dispute or legal proceedings. The amount due from shareholder arose from the return of defective goods and materials supplied in the ordinary course of business.

6. Inventories

In connection with the termination of the Subsidiary's operations other than legal proceedings, inventories were disposed of in the ordinary course of business until the balance of the inventories was sold at auction on December 8, 1987 for $263,325.

F-6

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements - Continued

9.    Long-term Debt

A summary of long-term debt follows:

|  | December 31 | |
|---|---|---|
|  | 1987 | 1986 |
| Notes payable to PBTC by the Subsidiary; bearing 8% interest, payable semi-annually; due in quarterly installments of $200,000 commencing March 31, 1988; secured by certain assets of the Subsidiary | $ 7,500,000 | $ 7,500,000 |
| Notes payable to former stockholders of the Subsidiary; non-interest bearing; due March 31, 1988; recorded net of 8% imputed interest; guaranteed by PBTC. PBTC's guarantee in turn is guaranteed by Prudential Securities Group Inc. | $ 3,924,000 | $ 3,620,000 |
| Note payable to a bank; bearing interest at the prime rate; due in April 1987; guaranteed by PBTC | --- | 788,000 |
| Capital lease obligations | --- | 745,000 |
| Various notes payable bearing interest from 11% to 13%; due at various dates through 1989; certain notes secured by equipment, certificates of deposit and/or guarantees by PBTC | --- | 870,000 |
|  | 11,424,000 | 13,523,000 |
| Long-term debt due within one year | 4,724,000 | 1,692,000 |
|  | $ 6,700,000 | $11,831,000 |

F-8

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements - Continued

The notes payable to former common stockholders of the Subsidiary were delivered in connection with the reorganization described in note 2. Each former common stockholder also received a warrant ("Initial Warrant") which permits the holder to obtain another warrant ("Final Warrant") by surrendering either 50% or 100% of the principal amount of the holder's notes in payment of the Initial Warrant exercise price. Initial Warrants are exercisable at any time before 5:00 P.M. California time on March 31, 1988. A holder of a Final Warrant in turn would (under limited conditions) be entitled to acquire convertible notes of Parent aggregating up to $15,000,000. The Final Warrants expire on March 31, 1991 (or sooner under certain circumstances).

If ever issued, the convertible notes referred to in the preceding paragraph would mature five years from the date of issuance; bear interest, payable semiannually, at 8%; would be redeemable one year after issuance at the Parent's option; and would be convertible into no more than 22.5% of common stock on a fully diluted basis.

10.     Leases

The Subsidiary leases its facilities under a lease classified as an operating lease. Rent expense was $450,000 in 1987 and $391,000 in 1986. In 1987, the Subsidiary terminated all of its equipment leases and incurred charges of $145,100.

11.     Preferred Stock

Holding is authorized to issue 7,500,000 shares of preferred stock of which all shares were held by PBTC and PCIS at December 31, 1987.

The preferred stockholder is entitled to receive dividends, when declared by the Board of Directors, equivalent to common stock dividends; entitled to a liquidation preference of $1.00 per share plus all declared but unpaid dividends; subject to having such preferred stock redeemed, at Parent's option, at $1.00 per share; entitled to conversion into common stock on a share for share basis; and entitled to voting privileges equal to common stockholders on an "as if converted" basis.

F-9

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements - Continued

12.  Common Stock

Parent is authorized to issue 150,000,000 shares of common stock of which an aggregate 22,500,000 shares were held by PBTC, PCIS, Kyocera and Kyocera (Hong Kong), Ltd. at December 31, 1987.

Parent reserved 3,000,000 shares of common stock for issuance under its 1986 stock option plan. Under that plan, options generally expire on the earlier of five years from the date of grant or 30 days after termination of employment or other relationship (for reasons other than death or disability). At December 31, 1987, no options were outstanding.

Pru-Tech holds a warrant to purchase up to 1,500,000 shares of Parent's common stock in the event of an initial public offering (note 2). Such warrant expires on December 23, 1991 and is exercisable at 50% of the initial public offering price. Pru-Tech has the option to put this warrant to PBTC at any time through March 31, 1988 for $500,000. The warrant is subject to antidilution provisions.

13.  Amended Technology Transfer and Manufacturing Agreement

During 1985 the Subsidiary entered into a Technology Transfer Agreement with Kyocera. Under the terms of that agreement, the Subsidiary transferred to Kyocera certain base technology and the Titan technology the Subsidiary had licensed from Pru-Tech. As part of the reorganization in 1986, the agreement was amended and Pru-Tech assigned all of its rights in the technology to the Subsidiary (note 2).

In December 1986, Kyocera and the Subsidiary executed the Amended Technology Transfer and Manufacturing Agreement. Under this amended agreement, Kyocera assigned its technology rights to the Subsidiary while other technology remained co-owned. Generally, under the amended agreement, Kyocera was given exclusive manufacturing rights for products incorporating the technology and the Subsidiary given the exclusive right to purchase those products.

Kyocera and the Subsidiary each contend that the other is in material breach of the terms of the Amended Technology and Manufacturing Agreement and both have ceased performing its terms. These claims, among others, are currently before the tribunal in an arbitration now pending between the Subsidiary, Parent and Kyocera (note 4).

F-10

LAPINE HOLDING COMPANY AND SUBSIDIARY

Notes to Consolidated Financial Statements – Continued

14.   Payables to PBTC

Payables to PBTC at December 31, 1987 consist principally of notes and inventory advances to the Subsidiary pursuant to a Financing Agreement dated December 29, 1987, as supplemented (the "Financing Agreement"). The Financing Agreement provides for inventory and certain trade receivable financing from PBTC up to $10,000,000. All advances bear interest at LIBOR and are secured by certain assets of the Subsidiary. Advances are repaid through the collection to trade receivables (note 5). The Financing Agreement terminates in April 1990, or sooner under certain circumstances. Included in payables to PBTC at December 31, 1987 is an amount of $4,873,000 payable to Kyocera for products purchased by Subsidiary.

15.   Subsequent Events

In January 1988, the Subsidiary and its landlord terminated its lease for the facility located at 182 Topaz Street, Milpitas, California upon payment of $293,530.

In February 1988, a federal court dismissed all of the shareholder derivative claims alleged by plaintiff in the suit against the Subsidiary and Parent (note 4) permanently and without leave to amend and dimissed the remainder of plaintiff's class action claims with leave to restate such claims within a specified time. Plaintiff filed a restated complaint in March 1988.

PBTC has informed Parent that in March 1988, Pru-Tech notified PBTC of Pru-Tech's election to put its warrant to purchase Parent common stock to PBTC for $500,000.

F-11

DESCRIPTION OF FINAL WARRANTS AND
SECURITIES ISSUABLE UPON EXERCISE*

FINAL WARRANTS

A Final Warrant would be issued under the Indenture upon the exercise of an Initial Warrant.

Conditions to Exercise.

Final Warrants may not be exercised for Convertible Notes until the date (the "Issue Date") of the earlier of (1) the closing of the first underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act"), of equity securities of Holding (in which case the Final Warrants will be automatically exercised on the conditions described below) or (2) the closing of a reorganization or merger of Holding or the Company, or a sale of substantially all of the stock or assets of the Company (except with or to Holding, PBTC, Kyocera or other Company affiliates). Final Warrants would expire at 5:00 p.m. California time on the earlier of December 23, 1991 or the filing with the Secretary of State of California of a certificate of dissolution of the Company and the filing with the Secretary of State of Delaware of a certificate stating that the dissolution of Holding has been authorized in accordance with the applicable statutory provisions (or, in either case, comparable action dissolving such corporation or any successor corporation).

The exercise price for a Final Warrant would be $1 per $100 of principal (i.e., 1%) of the resulting Convertible Note. If Final Warrants are automatically exercised as described above, they must be surrendered with the appropriate payment on or before the 180th day after the date Holding delivers to the holders of Final Warrants notice of the closing of the first underwritten public offering of Holding's equity securities or they would be deemed to have been cancelled prior to exercise.

---

* Capitalized terms used in this Appendix II shall have the same meanings as provided therefor in the Notice to which this Appendix II is attached.

-1-

### Request for Registration.

If none of the events described in clauses (1) or (2) in the preceding section above has occurred by March 31, 1988, and if Final Warrants (other than Final Warrants held by PBTC or PSGI in return for payments under their guarantee or to Holding as described below) to subscribe for Convertible Notes in the principal amount of at least $4 million are then outstanding, Holding would be required, at the request of the holders of at least 50% of the then outstanding Final Warrants excluding any held by PBTC or PSGI (determined on the basis of the principal amount of Convertible Notes issuable upon exercise of Final Warrants) and subject to certain conditions specified in Final Warrants, to use reasonable efforts to effect an underwritten public offering of its Common Stock for the purpose of satisfying the condition to the exercise of Final Warrants.

However, Holding would have no obligation to effect such an offering unless the holders of Final Warrants submit to Holding a letter of intent from an underwriter of national reputation reasonably acceptable to Holding for a firm commitment offering of Holding's Common Stock. The letter would have to specify an underwriting value for the Company of $50 million or more, which will provide proceeds to Holding of at least $15 million. The closing of the underwritten public offering requested by such holders of Final Warrants would have to be reasonably expected to occur, and in fact occur, on or before the expiration date of the Final Warrants, except that the expiration date would be postponed for a reasonable time, in no event to exceed nine months, if the request and letter of intent are submitted after September 30, 1991.

Holding would have a one-time right to reject any such registration request, in which case holders would be permitted to make a second request (on the terms and conditions described above) if such second request was made 12 months after the rejected registration request (or 6 months after the rejected request if the rejected request was made in calendar year 1991). Except for a second request made after Holding's rejection of the holders' first request, holders of Final Warrants would have the right to make only one such request.

Any holders of the Final Warrants would probably face substantial difficulty in organizing and soliciting their group to obtain the 50% agreement to present such a request and, it is Holding's view that it is unlikely that based on the financial condition of the Company, the holders would be able to obtain such a letter of intent from a qualifying underwriter. No procedure or mechanism currently exists, and the Trustee under the Indenture has no obligation, to organize or solicit the group, and the expense of such organization and solicitation would have to be borne by the holders of Final Warrants.

-2-

## PBTC and PSGI Guarantees.

As stated in the Notice to which this Appendix is attached, PBTC guaranteed the Original Notes. PBTC's guarantee in turn is guaranteed by PSGI. In addition, PBTC is obligated to reimburse the Company in the amount of Original Notes paid by the Company. To the extent PBTC or PSGI pays the Original Notes under its respective guarantee or PBTC reimburses Holding for its payment of the Original Notes, PBTC or PSGI, as the case may be, will be entitled to receive Final Warrants to acquire a pro rata portion of the Convertible Notes.

## Restricted Securities.

Final Warrants would be "restricted securities" under federal and state securities laws in that they could not be sold or transferred (except in limited situations) unless registered in compliance with such laws or transferred in a transaction exempt therefrom. They would not be registered and no exemption is expected to be generally available. No market for Final Warrants would be expected to arise. Consequently, persons receiving Final Warrants should not expect to be able to sell them. If Final Warrants were to become exercisable by reason of a public offering as provided in (1) above, Holding would cause the Convertible Notes and Common Stock issuable upon conversion thereof to be registered under the Act. If a Final Warrant were to become exercisable as provided in (2) above, Holding would obtain, if necessary, a permit from the California Corporations Commissioner to issue Convertible Notes and Common Stock issuable upon conversion thereof. If required, Holding would use its best efforts to qualify the Indenture under the Trust Indenture Act of 1939, as amended, prior to the Issue Date.

Except in the case of certain specified exempt transfers, Holding would have a right of first refusal to any proposed transfer of an interest in a final Warrant. In addition, a partial transfer of a Final Warrant which would result in either the transferred or retained Final Warrant being exercisable for the right to subscribe for Convertible Notes in principal amounts less than $15,000 would be prohibited.

HOLDERS OF FINAL WARRANTS WOULD NOT HAVE ANY RIGHT TO PARTICIPATE IN OR TO RECEIVE ASSETS UPON THE DISSOLUTION OR LIQUIDATION OF HOLDING OR THE COMPANY AND WILL NOT BE ENTITLED TO ANY VOTING RIGHTS OR OTHER RIGHTS AS SHAREHOLDERS OF HOLDING.

EACH HOLDER SHOULD UNDERSTAND THAT, UPON EXERCISE OF AN INITIAL WARRANT, THE HOLDER WILL BE SURRENDERING AN ORIGINAL NOTE GUARANTEED AS TO THE PAYMENT FOR A FINAL WARRANT WHICH IS NOT READILY TRANSFERABLE, WHICH IS NOT EXERCISABLE EXCEPT UNDER CERTAIN LIMITED CIRCUMSTANCES, AND WHICH WOULD MOST PROBABLY EXPIRE WITHOUT EVER BECOMING EXERCISABLE. IF A FINAL WARRANT EXPIRES BEFORE IT BECOMES EXERCISABLE, ITS HOLDER WOULD MOST PROBABLY RECEIVE NOTHING.

CONVERTIBLE NOTES

Convertible Notes would be issued under the Indenture upon exercise of Final Warrants.

Terms of Convertible Notes.

Convertible Notes would mature five years from the Issue Date and would provide for interest on the unpaid principal amount at the rate of 8% per year, payable semiannually beginning 180 days after the Issue Date. At any time and from to time, after the first anniversary of the Issue Date, Holding, upon at least 30 days notice would be able to redeem Convertible Notes for 100% of the principal amount to be redeemed plus accrued interest. Convertible Notes called for redemption would be convertible at any time before the redemption date. Interest on Convertible Notes called for redemption would cease to accrue on and after the redemption date.

Assuming Convertible Notes in the full amount of $15 million were issued, all Convertible Notes would be convertible at any time into an amount of Common Stock of Holding equal to no more than 22.5% of the Common Stock of Holding outstanding on a fully diluted basis on the Issue Date (excluding any stock issued to, or issuable pursuant to options granted to, employees, directors and consultants pursuant to certain incentive stock plans and any new securities issued in connection with the first underwritten public offering of Holding securities or issued pursuant to a reorganization, merger or sale of substantially all stock or assets of the Company). If Convertible Notes in an amount less than $15 million were to be issued, the amount of Common Stock into which Convertible Notes may be converted would decrease proportionately. The Convertible Notes would contain limited anti-dilution provisions. A holder of a Convertible Note would be entitled to convert a portion of the note only if the portion was $1000 or a whole multiple of $1000 and the remaining balance was at least $1000.

Default.

Each of the following would constitute a default under the Convertible Notes: (1) failure of Holding to pay interest on any Convertible Notes within sixty (60) days after the same becomes due and payable, (2) failure of Holding to pay the principal of the Convertible Notes on or before thirty (30) days after maturity, (3) failure of Holding to comply with its agreements in the Convertible Notes or Indenture and (4) certain bankruptcy proceedings.

Pursuant to the Indenture, if a default under the Convertible Note occurred and was continuing, the Trustee (except for the default described in clause (3) above) could accelerate the maturity date of the Convertible Notes and could pursue any available remedy to collect

-4-

payment of the Convertible Notes on behalf of holders of the Convertible Notes. The Trustee would have a duty to exercise remedies in a prudent manner. The Trustee would be entitled to refuse to perform unless it received indemnity satisfactory to it against any loss or liability. Holders of Convertible Notes would not be entitled to directly enforce the payment of the Convertible Notes except under limited circumstances. Subject to certain limitations, holders of 66-2/3% of the aggregate principal amount of the outstanding Convertible Notes could direct the Trustee in its exercise of any Trust or power.

### Amendment.

Subject to certain exceptions, the Convertible Notes could be amended with the consent of Holding and holders of at least 66-2/3% of the aggregate principal amount of the outstanding Convertible Notes. Without the consent of such holders, the Convertible Notes could be amended to cure any ambiguity, defect or inconsistency or to make any change that does not adversely affect the rights of any holder thereof.

### Restricted Securities.

Convertible Notes would be "restricted securities" if they were not registered under the Act as described above. In such case, the holders would be entitled to include any shares issued upon conversion of such notes with any shares offered for the account of shareholders in most public offerings of securities that Holding undertook either of its own accord or at the request of any other shareholder or shareholders. In addition, a partial transfer of a Convertible Note would be prohibited unless both the transferred and retained portions were in principal amounts not less than $15,000. The indebtedness evidenced by Convertible Notes would be subordinated and junior in right of payment to all other indebtedness of Holding except indebtedness represented by the Original Notes and indebtedness expressly subordinated to or expressly placed on parity with the Convertible Notes. There would be no limitation on the issuance of senior indebtedness.

Appendix III
to Notice

LETTER OF TRANSMITTAL TO ACCOMPANY SUBORDINATED
NOTES DUE MARCH 31, 1988 OF LAPINE HOLDING COMPANY

To: LaPine Holding Company                    Date: _____
    c/o Bishop Trust Company, Limited
    1000 Bishop Street
    Corporate Trust Department
    Room 409
    Honolulu, Hawaii 96804
    Attention: Astika Botejue


     The undersigned holder(s) of the within Subordinated Note Due
March 31, 1988 ("Original Note") of LaPine Holding Company hereby
surrenders such Original Note for payment. You are authorized to issue a
check in payment of the Original Note in the principal amount of such
Original Note and in the name specified on the face of the Original Note.

     Unless the undersigned instructs that the payment be mailed to a
different address, payment for the Original Note surrendered herewith
should be mailed to the address indicated.


Principal Amount:_____

                                   (Signature(s) must conform in all
                                   respects to name(s) of holder(s)
                                   as specified on the face of the
                                   Original Note)

Number on
face of
Original
Note: _____           Address:_____


                                  _____
                                  (Include Zip Code)

Special Mailing Instructions      Form W-9

To be completed ONLY if a check   A completed Form W-9 ____ is
is to be sent to an address other ____ is not (check one) enclosed.
than the address shown above


Mail to:  Name_____

          Address_____

          _____
          (Include Zip Code)